Maxim B. Litvak (CA Bar No. 215852)
Pamela E. Singer (CA Bar No. 224758)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
E-mail: mlitvak@pszjlaw.com
psinger@pszjlaw.com

Attorneys for the Official Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>A.F. Evans Company, Inc.,<br><br>            Debtor. | Case No.: 09-41727-EDJ<br><br>Chapter 11<br><br>**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DISTRIBUTION OF SALE PROCEEDS TO CITY NATIONAL BANK**<br><br>*[No Hearing Requested]* |

      The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtor and debtor in possession herein (the "Debtor") hereby objects to the distribution of any proceeds from the sale of the Debtor's assets to City National Bank ("CNB") on the basis that the security interests asserted by CNB against the Debtor appear to have been terminated. The Committee submits this objection in connection with the Court's *Order Granting Motion to Sell and Assign Partnership Interest* (the "Sale Order"), entered on April 9, 2009, pursuant to which the Court authorized the Debtor to sell (the "Sale") its general partnership interest in AFE-Pioneer Associates, LP ("AFE-Pioneer"). As part of the Sale Order, the Debtor is required to immediately remit 87.5% of the proceeds of the Sale to CNB, unless the Committee timely raises a defect in CNB's asserted security interests. The Committee's deadline to object was extended by stipulation of the parties and order of the Court to May 5, 2009.

As set forth more fully below, the Committee believes that CNB's asserted liens against the Debtor's assets, specifically including its interests in AFE-Pioneer, may be defective. Accordingly, the Court should decline to allow any sale proceeds to be remitted to CNB at this time. At most, such sale proceeds should be segregated pending the determination of the validity of CNB's asserted security interests against the Debtor.[1] The factual assertions set forth herein are supported by the *Declaration of Maxim B. Litvak* submitted concurrently herewith (the "Litvak Declaration").

## I.

## INTRODUCTION

The official record of the California Secretary of State (the "Secretary") reveals that CNB's underlying financing statement against the Debtor has been terminated. It appears that two termination statements were filed of record as part of the Debtor's sale earlier this year of two partnership interests. Instead of merely reflecting a release of collateral covering these two pending sales, the termination box was checked on two amendments filed with the Secretary. As a result, the Secretary officially listed CNB's original financing statement as having been terminated. Within a matter of days, CNB filed correction statements in an effort to explain that its security interest had not been terminated, but these efforts were ineffective because the underlying financing statement had already been terminated as a matter of record. CNB also did not file a new financing statement at that time (such filing would have been avoidable in any case as a preferential transfer).

The Committee does not yet know who filed the termination statements at issue or why the termination box was checked. CNB has provided the Committee with documents evidencing that CNB approved the proper forms to be filed releasing only certain specified collateral, and delivered such forms to First American Title Insurance Company ("First American"), the escrow agent for the contemplated asset sales, with authority to file such documents on CNB's behalf. For reasons that are not yet clear, the actual documents that were filed with the Secretary were the same ones approved by CNB, but with the termination box checked (apparently by way of a handwritten addition to the documents). Further investigation and discovery will be required to determine what

---

[1] The Committee is informed that the sale of the Debtor's general partnership interest in AFE-Pioneer has not yet closed and remains pending. There are no other sales that have been approved by the Court to date.

exactly happened, but based on the evidence available to date, it is clear that CNB's asserted security interests in the Debtor's assets are very much in doubt. Indeed, the Secretary reflects in the official record that CNB's underlying financing statement has been terminated.

Accordingly, the Committee urges the Court to order that the proceeds of the pending Sale (or any other sale) of the Debtor's assets should not be paid to CNB on account of its prepetition claims at this time. If necessary, such proceeds can be set aside pending further order of the Court. In this regard, it also bears mention that the Court is fully authorized to approve the Sale of the Debtor's interests in AFE-Pioneer (even over CNB's objection), pursuant to section 363(f)(4) of the Bankruptcy Code, because CNB's asserted liens are now the subject of a bona fide dispute.

## II.

## **RELEVANT FACTS**

On August 9, 2004, CNB filed a UCC Financing Statement (the "Original Financing Statement") with the Secretary in order to perfect its security interest in "All Inventory, Accounts (Fees Receivable), General Intangibles, Equipment and Chattel Paper" owned by the Debtor. A copy of the Original Financing Statement is attached to the Litvak Declaration as **Exhibit A**.

In January 2009, the Debtor sold its general partnership interests in Westgate Housing Associates L.P. ("Westgate") and Greenery Housing Associates, L.P. ("Greenery"). On January 8, 2009, Rick Bell, an officer of the Debtor, sent an email to CNB attaching proposed releases of CNB's security interests in Westgate and Greenery and escrow instructions with respect to the contemplated sales of such assets. A copy of this email is attached to the Litvak Declaration as **Exhibit B**.

Subsequently, CNB delivered correspondence to First American (these documents were also addressed to the Debtor) confirming that CNB would release its security interests in Westgate and Greenery upon payment of the purchase price from the pending sales of these assets. This correspondence is attached to the Litvak Declaration as **Exhibit C**. As part of such correspondence to First American, CNB expressly "***authorize[d] the filing of appropriate amendments***" to the Original Financing Statement (emphasis added). CNB has also informed the Committee that amended financing statements, in the form attached to the Litvak Declaration as **Exhibit D,** were

also provided by CNB to First American. These forms do not have the termination box checked. Instead, they only have the release of collateral box checked.

On January 28, 2009, two UCC Financing Statement Amendments (the "Termination Statements") referencing the Original Financing Statement were filed with the Secretary. The Termination Statements were identical to the forms previously approved by CNB, but with one glaring difference. Both Termination Statements had the termination box checked, which was followed by standard language stating that: "Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement." A copy of both Termination Statements is attached to the Litvak Declaration as **Exhibit E**. The Committee does not yet know who filed the Termination Statements, but they were duly recorded by the Secretary as having terminated the Original Financing Statement. A copy of pertinent excerpts of the summary of UCC filings recorded by the Secretary against the Debtor is attached to the Litvak Declaration as **Exhibit F**.

On February 6, 2009, CNB filed two additional UCC Financing Statement Amendments (the "Correction Statements") stating that the Termination Statements were filed without CNB's authority and that CNB had only authorized the release of its security interest in the Debtor's interest in the Westgate and Greenery general partnership interests. Copies of the Correction Statements are attached to the Litvak Declaration as **Exhibit G**. However, these Corrections Statements were ineffective because the Original Financing Statement had already been terminated. CNB clearly authorized the filing of "appropriate amendments" to the Original Financing Statement. Unfortunately for CNB, the wrong amendments were filed. Under California law, CNB may now have a claim against the party that made such mistake, but from the perspective of this estate, CNB appears to be a mere unsecured creditor.

///

///

///

///

///

OBJECTION TO DISTRIBUTION OF SALE PROCEEDS
TO CITY NATIONAL BANK
4
Case: 09-41727    Doc# 133    Filed: 05/05/09    Entered: 05/05/09 16:01:42    Page 4 of 9

## III.

## ARGUMENT

**A.   The Termination Statements Were Authorized and Effective in Terminating CNB's Security Interests Against the Debtor**

Section 9513(d) of the California Commercial Code provides that:

> Except as otherwise provided in Section 9510, upon the filing of a termination statement with the filing office, the financing statement to which the termination statement relates ceases to be effective.

Section 9510(a) of the California Commercial Code provides that "[a] filed record is effective only to the extent that it was filed by a person that may file it under Section 9509."

Section 9509(d) of the California Commercial Code provides in pertinent part:

> A person may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement only if . . . The secured party of record authorizes the filing.

These statutory provisions make clear that a termination statement is effective if it is "authorized" by the secured party -- meaning that a third party with no relationship with the secured party cannot simply file a termination statement because they feel like doing so. Unfortunately, neither the California Commercial Code nor the Uniform Commercial Code, upon which it is based, define the term "authorizes." The Official Comments to section 9509 of the Uniform Commercial Code state in relevant part that: "Law other than this Article . . . generally determines whether a person has the requisite authority to file a record under this section."

As a matter of applicable California law, it appears that CNB authorized its agent, First American, to file "appropriate amendments" to the Original Financing Statement and is now bound by the Termination Statements that were actually filed (even if such filings contain mistakes).

**B.   CNB is Bound By the Mistakes of Its Agent While Acting Within the Scope of Such Agent's Authority**

"An agent is one who represents another, called the principal, in dealings with third persons." CAL. CIV. CODE § 2295. "An agent may be authorized to do any acts which his principal might do, except those to which the latter is bound to give his personal attention." CAL. CIV. CODE § 2304.

Consideration is unnecessary to create an agency. CAL. CIV. CODE § 2308. Finally, "[a]ctual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." CAL. CIV. CODE § 2316.

Here, CNB authorized First American to amend CNB's Original Financing Statement to release CNB's security interests in the Westgate and Greenery assets. First American was acting as the escrow agent in that sale transaction and CNB designated First American as agent for the limited purpose of effectuating the necessary filings. Although the Committee does not yet know who actually filed the Termination Statements, to the extent they were filed by First American, the escrow agent was clearly acting within the scope of its authority and CNB is now responsible for the ramifications of First American's conduct. (CNB may have a claim against the party that wrongfully filed the Termination Statements, but that is not an issue for this estate. *See* CAL. CIV. CODE § 9625.)

The Ninth Circuit long ago established that an agent's mistake or disregard of the principal's instructions does not take the agent's actions outside the scope of the agent's authority. In *Goddard v. Metropolitan Trust Co. of California,* 82 F.2d 902 (9th Cir. 1936), a principal authorized an agent to make a loan to a third person and to acquire a security interest in collateral in exchange for the loan. The agent made the loan but failed to acquire the security interest. The principal then sued the agent for conversion for giving away the principal's money without authorization. The court held that while the agent clearly violated the principal's instructions, he was still acting within the scope of his agency, and, therefore, could not be found liable for conversion. *Id.* at 904.

Here, like the agent in *Goddard*, First American (to the extent that it is the responsible party for the Termination Statements at issue) may have acted contrary to CNB's intentions or even its directions, but it was still acting within the scope of CNB's authorization to file the "appropriate amendments" of the Original Financing Statement. As the Ninth Circuit stated in *Goddard*, "[t]he complaint shows, not a complete departure from the agent's authority, but a mere violation of the principal's instructions regarding the manner in which the authority should be exercised." *Goddard,* 82 F.2d at 904. That may be precisely what happened here. First American was supposed to file amendments to the Original Financing Statement releasing certain specified collateral in accordance

with CNB's direction, but First American may have made the mistake of filing the Termination Statements instead. Under *Goddard,* this mistake does not render the action unauthorized.

Other cases bolster the point. For example, in *Morrow Crane Co. v. Affiliated FM Ins. Co.,* 885 F.2d 612 (9th Cir. 1989), an agent violated his principal's instructions by contracting to have cranes shipped above deck, instead of below deck. The court held that although the agent had botched the job, the principal nonetheless remained bound by the agent's contract with the shipper because the agent entered into the contract while performing the assigned task of arranging shipment. *Id*. at 615. The same is true here. Even though First American may have checked the wrong box, CNB remains bound because First American was performing its assigned task of amending the Original Financing Statement.

Finally, in *Smith v. Deutsch,* 89 Cal.App.2d 419, 425 (Cal. Ct. App. 1949), the court stated:

> It is not necessary that a specific act, or failure to act, be authorized as such by the principal to bring it within the scope of the agent's authority. *It is within the scope of his authority if it is done while the agent is engaged in the transaction of business which has been assigned to him for attention by his principal . . . .* (emphasis added).

Here, First American may have made a mistake while "engage[d] in the transaction of business which [had] been assigned" by CNB, which was to amend the Original Financing Statement, but CNB remains bound and the Termination Statements were effective.

### C. The Termination Statements Are Effective Even if They Were Filed By Mistake

The Ninth Circuit has held that a termination statement filed by mistake is effective in terminating the creditor's security interest. In *Koehring Company v. Nolden (In re Pacific Trencher & Equip., Inc.)*, 735 F.2d 362 (9th Cir. 1984), a secured lender agreed to release its security interest in certain of the debtor's assets. It inadvertently checked the termination box and listed the released collateral. Later discovering its mistake, the lender filed a new financing statement. When the debtor filed bankruptcy, the secured lender filed an adversary proceeding seeking to reform its financing statement to provide that it had not been terminated. The Ninth Circuit ruled that reformation did not apply.

///

///

The Ninth Circuit also rejected the argument that mistakenly checking the termination box, but also listing released collateral, was not "seriously misleading" pursuant to section 9506 of the California Commercial Code. The Ninth Circuit held:

> It is not determinative that no actual creditor was misled. It matters that a potential creditor could have been misled. Consequently, it is the conclusion of this court that the error resulting in the termination of the financing statement was seriously misleading viewed from the standpoint of a potential creditor reviewing the records.

*Id.* at 364 (quotations and citations omitted). The Ninth Circuit also rejected the secured lender's argument that the financing statement was only a termination as to the collateral that was listed. "Checking the Termination box operates as complete termination of the financing statement." *Id.* at 364-65.

Other courts agree. *See Crestar Bank v. Neal (In re Kitchen Equip. Co. of Virginia),* 960 F.2d 1242 (4th Cir. 1992) (lender checked termination box, but then listed collateral to be released; held: financing statement was terminated); *Peoples Bank of Kentucky, Inc. v. US Bank (In re SJ Cox Enters., Inc.)*, 2009 WL 939573 *4 (Bankr. E.D. Ky. 2009) ("[t]he filing of a termination statement cannot be considered a minor error."); *In re Hampton*, 2001 WL 1860362 (Bankr. M.D. Ga. 2001) (creditor was unsecured where it mistakenly terminated financing statement); *In re Silvernail Mirror & Glass, Inc.,* 142 B.R. 987, 989 (Bankr. M.D. Fla. 1992) (court could not apply equitable principles to reinstate creditor's lien against debtor's assets where creditor mistakenly filed a termination statement terminating its financing statement).

Accordingly, even if the Termination Statements were filed by mistake, they were effective in terminating CNB's asserted security interests against the Debtor. The fact that both the termination and release of collateral boxes were checked does not change this result, neither does CNB's subsequent filing of the Correction Statements. As reflected in the Secretary's official record, the Original Financing Statement has been terminated.

## IV.

## CONCLUSION

Based on the foregoing, there is a bona fide dispute as to the validity of CNB's asserted liens against the Debtor. It appears that CNB's liens were terminated prepetition. Although the

Committee does not yet have all the facts, there is clearly enough of an issue here to suspend any immediate distribution of sale proceeds to CNB. In light of this dispute, the Court is also well within its authority to authorize the pending Sale of the Debtor's interests in AFE-Pioneer over CNB's objection (to the extent one is asserted) pursuant to section 363(f)(4) of the Bankruptcy Code.

Dated: May 5, 2009  PACHULSKI STANG ZIEHL & JONES LLP

By  */s/ Pamela E. Singer*
Pamela E. Singer
Attorneys for the Official Committee of
Unsecured Creditors