1  FRANK T. PEPLER (SBN 100070)
   T. SCOTT BUCEY (SBN 202657)
2  PEPLER MASTROMONACO LLP
   100 First Street, 25th Floor
3  San Francisco, CA 94105
   Telephone:    (415) 978-9860
4  Facsimile:    (415) 978-9862

5  Attorneys for City National Bank

6

7

8

9              UNITED STATES BANKRUPTCY COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11
   **In re**                                    | **Case No. 09-41727 EDJ**
12
   **A.F. EVANS COMPANY, INC.,**                | **Chapter 11**
13
                                        **Debtor.** | **NOTICE OF MOTION AND MOTION
14                                                  | OF CITY NATIONAL BANK FOR
                                                   | ORDER REQUIRING DEBTOR TO
15                                                 | REMIT SALE PROCEEDS OF
                                                   | COLLATERAL**
16
                                                   | **Judge Jellen**
17
                                                   | **Hearing Date:    July 2, 2009**
18                                                 | **Time:            2:30 pm**
                                                   | **Ctrm:            215**
19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL
{R664\0009\00469895.DOC;v1}

Case: 09-41727   Doc# 167   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 1 of
23

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................ 2

II.     PROCEDURAL BACKGROUND ........................................................ 3

     A.     Cash Collateral Stipulation ..................................................... 4

     B.     Sale Motion; Committee Sale Objection; Sale Order ................ 4

     C.     Committee Sale Proceeds Objection ........................................ 5

III.    FACTS .............................................................................................. 5

     A.     Uncontested Facts .................................................................. 5

     B.     Additional Facts. .................................................................... 9

IV.     ARGUMENT .................................................................................... 10

     A.     An Unauthorized Filing is Ineffective Under UCC Section 9-510 ...... 11

     B.     An Escrow Agent's Authority is Limited by Its Instructions. .............. 12

     C.     A Financing Statement Amendment with Both the Termination Box
         Checked and a Collateral Amendment Box Checked Does Not
         Automatically Constitute a Termination Statement. .............................. 16

V.      CONCLUSION .................................................................................. 19

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

{R64\0009\00469895.DOC;V1}

Case: 09-41727    Doc# 167    Filed: 06/12/09    Entered: 06/12/09 17:04:29    Page 2 of
23

# TABLE OF AUTHORITIES

Page

**Cases**

Crestar Bank v. Neal (In re Kitchen Equip. Co. of Virginia),
   960 F.2d 1242 (4th Cir. 1992) ........................................................................... 17

Goddard v. Metropolitan Trust Co. of California,
   82 F.2d 902 (9th Cir. 1936) ............................................................................... 15

Greenzweight v. Title Guarantee & Trust Co.,
   1 Cal.2d 577, 36 P.2d 186 (1934) ...................................................................... 13

In re Munger, 495 F. 2d 511, 512 (9th Cir. 1974) ....................................................... 17

Koehring Company v. Nolden (In re Pacific Trencher & Equip., Inc.),
   735 F.2d 362 (9th Cir. 1984) ............................................................ 16, 17, 18, 19

Montgomery v. Bank of America Nat. Trust & Savings Ass'n,
   85 Cal.App.2d 559, 193 P.2d 475 (Cal.App. 2 Dist. 1948) ................................ 13

Morrow Crane Company v. Affiliated FM Insurance Company,
   885 F.2d 612, 615 (9th Cir. 1989) ...................................................................... 14

Silvernail Mirror and Glass, Inc.,
   142 B.R. 987 (Bankr. M. D. Fla. 1992) .............................................................. 17

Todd v. Vestermark,
   145 Cal.App.2d 374, 302 P.2d 347 (Cal.App.2.Dist., 1956) .............................. 13

Watts v. Mohr,
   86 Cal.App.2d 256, 194 P.2d 758 (Cal.App.2.Dist., 1948) ................................ 13

**Statutes**

11 U.S.C. § 101 ................................................................................................................ 1

11 U.S.C. § 552(b) ........................................................................................................... 1

Cal. Comm. Code § 9101 ............................................................................................... 11

Cal. Comm. Code § 9502 ............................................................................................... 18

Cal. Comm. Code § 9506(a) .......................................................................................... 16

Cal. Comm. Code § 9509 ............................................................................... 11, 15, 18

Cal. Comm. Code § 9509(d) .................................................................. 11, 14, 15, 16

Cal. Comm. Code § 9510 ...................................................................................... 15, 18

Cal. Comm. Code § 9510(a) ............................................................................ 11, 15, 16

ii

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL
{1664\0009\00469893.DOC.V1}

Case: 09-41727   Doc# 167   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 3 of
23

1  Cal. Comm. Code § 9516(b) ........................................................................ 12, 15

2  Cal. Comm. Code § 9518 ................................................................................... 18

3  Cal. Comm. Code § 9520 ................................................................................... 15

4  Cal. Comm. Code § 9520(b) ...................................................................... 12, 18

5  Uniform Commercial Code § 9-510 ................................................................. 11

6  Uniform Commercial Code § 9-510(a) ............................................................ 11

7  Uniform Commercial Code § 9-502 ........................................................... 11, 12

8  Uniform Commercial Code § 9-520 ................................................................. 12

9  **Rules**

10  Local Bankruptcy Rule 9014-1(b)(2) .................................................................. 1

11  **Treatises**

12  9B Hawkland's Uniform Commercial Code Series (West 2001) ............................. 11

13  John C. Murray, Effect of a UCC-3 Financing Statement Where Both the Amendment and
    Termination Boxes Are Checked, published at
14  http://www.firstam.com/content.cfm?id=3236 (2006) .......................................... 14, 15, 16

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

{r664\0009\00469895.DOC;v1}

TO THE HONORABLE EDWARD D. JELLEN, THE UNITED STATES TRUSTEE, THE DEBTOR, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND OTHER PARTIES IN INTEREST:

**PLEASE TAKE NOTICE** that at the above-stated time and location, City National Bank ("CNB") will move the Court pursuant to Local Bankruptcy Rule 9014-1(b)(2)[1] and 11 U.S.C. §§ 552(b) and 105 (11 U.S.C. §§ 101, *et seq.* the "Bankruptcy Code") for entry of an order authorizing and directing A.F. Evans Company, Inc. (the "Debtor") to remit to CNB 87.5% of sale proceeds from the sale of the Debtor's interests in AFE-Pioneer Associates, LP (the "AFE-Pioneer Sale") as and when received by the Debtor, pursuant to the requirements of the cash collateral stipulation between the Debtor and CNB approved by Orders of the Court entered on March 31, 2009, April 15, 2009 and April 29, 2009, and the Court's April 9, 2009 order approving the AFE-Pioneer Sale.

CNB makes this Motion, and requests that the Debtor be ordered to pay proceeds of the AFE-Pioneer Sale to CNB, in response to the "Objection of Official Committee of Unsecured Creditors to Distribution of Sale Proceeds to City National Bank" filed on May 5, 2009 (Doc. 133) (the "Sale Proceeds Objection"). CNB submits that the Sale Proceeds Objection lacks merit. Nonetheless, by reason of its filing of the Sale Proceeds Objection, the Committee has arguably triggered the provision in the Court's April 9, 2009 order approving the AFE-Pioneer Sale, which states that "[u]nless the Official Committee of Unsecured Creditors has filed a pleading in this case . . . asserting a defect in CNB's lien rights in the Debtor's interests in AFE-Pioneer . . .", then the Debtor <u>shall</u> remit 87.5% of the sale proceeds to CNB. CNB requests that the Court overrule the Sale Proceeds Objection and direct the Debtor to comply with its obligations under the cash collateral stipulation and AFE-Pioneer Sale order.

**PLEASE TAKE FURTHER NOTICE THAT PURSUANT TO LOCAL RULE 9014-1(c)(2), ANY OBJECTION TO THE PROPOSED RELIEF MUST BE FILED WITH**

---

[1] All references to "Local Rule" or "Local Rules" are to the Local Rules of the United States Bankruptcy Court for the Northern District of California.

1  **THE COURT AND SERVED UPON COUNSEL FOR CNB NOT LESS THAN FIVE (5)**

2  **DAYS BEFORE THE SCHEDULED HEARING DATE.**

3      **PLEASE TAKE FURTHER NOTICE THAT ANY OBJECTION TO THE RELIEF**

4  **REQUESTED BY CNB MUST BE ACCOMPANIED BY ANY DECLARATIONS OR**

5  **MEMORANDA OF LAW THE OBJECTING PARTY WISHES TO PRESENT IN**

6  **SUPPORT OF ITS POSITION.**

7  **I.      INTRODUCTION**

8      In part of its ongoing effort to block remittance to CNB of proceeds of CNB collateral as

9  required by the Court's orders approving the cash collateral stipulation between CNB and the

10  Debtor (more fully identified below), the Committee purports to raise by its Sale Proceeds

11  Objection the issue of whether CNB's August 9, 2004 Uniform Commercial Code financing

12  statement has been terminated, notwithstanding clear proof that CNB has never authorized

13  anything other than partial releases of collateral from the scope of its blanket filing.  The

14  Committee attempts to characterize legal documents that are *unauthorized* and *ineffective* as

15  exactly the opposite -- authorized and effective.  Specifically, the Committee focuses on two

16  UCC3 financing statement amendments that CNB delivered in connection with the mid-January

17  2009 sales of the Debtor's general partnership interests in its "Greenery" and "Westgate" projects

18  to third-party purchaser The Reliant Group ("Reliant").  Reliant is also the purchaser in the AFE-

19  Pioneer Sale, as well as the other two sales that the Debtor has advanced for Court approval.

20      In connection with the Greenery and Westgate sales, CNB signed written escrow

21  instructions authorizing the escrow agent for those sales (not an agent of CNB, not an employee

22  of CNB, but an escrow agent selected by the Debtor and/or Reliant in connection with the

23  specific Greenery and Westgate sales) to file appropriate UCC financing statement amendments

24  releasing the Greenery and Westgate partnership interests from the scope of CNB's blanket

25  security interest.  Appropriate UCC3 financing statements amendments accompanied the signed

26  escrow instructions when they were returned to the escrow agent.  Ultimately, financing

27  statement amendments were filed.  However, without any authorization from CNB, and after

28  CNB had reviewed and approved the filing of the UCC3 amendments with only the "amendment

2

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL
{1664\0009\00469895.DOC;V1}

Case: 09-41727    Doc# 367    Filed: 06/12/09    Entered: 06/12/09 17:04:29    Page 6 of
23

(collateral change)" box checked, the "termination" boxes on the amendments were also checked, before the amendments were filed with the California Secretary of State. The lack of authorization from CNB is key because, under California's enactment of Revised Article 9 of the Uniform Commercial Code, unauthorized filings are completely ineffective. When CNB discovered the unauthorized filings by a routine search of the Secretary of State records, it promptly filed corrective statements, clarifying that termination statements had not been authorized and the only collateral released by the earlier amendments were the Greenery and Westgate partnership interests.

The Committee wishes to characterize the unauthorized checking of the termination boxes on the Greenery and Westgate amendments as having been authorized by CNB, and as having been effective to terminate CNB's long filed financing statement. The Committee refuses to concede that the filings at issue merely amended CNB's original financing statement to release the Greenery and Westgate partnership interests as indicated not only in the UCC3 amendments themselves but also in CNB's accompanying written instructions to the escrow agent. The Committee is simply wrong: CNB did not authorize the termination of its blanket filing, and there being no authorized termination, the authorized releases of the Greenery and Westgate partnership interests are the only modifications made to the otherwise continuing effective filing in favor of CNB. The Court should reject the Committee's assertion and should not permit the Sale Proceeds Objection to block CNB's bargained-for right to receive proceeds of the AFE-Pioneer Sale. CNB respectfully requests that the Court enter an Order that directs the Debtor to remit 87.5% of the AFE-Pioneer Sale proceeds to CNB, notwithstanding the filing of the Sale Proceeds Objection, as specified in the cash collateral stipulation and in the Order approving the AFE-Pioneer Sale.

## II. PROCEDURAL BACKGROUND

CNB was the longtime pre-petition operating lender to the Debtor. It provided financing to the Debtor under a revolving line of credit secured by essentially all personal property assets of the Debtor. CNB's security interest was perfected by a UCC1 original financing statement filed on August 9, 2004 as document number 04-1000359638 (the "CNB Financing Statement").

3

{R664\0009\00469893.DOC;v1}

1    When the Debtor filed its Chapter 11 petition, CNB entered into a Stipulation Regarding Cash

2    Collateral and Adequate Protection with the Debtor (filed on March 9, 2009, Doc. 14; as the

3    same has been amended, the "Cash Collateral Stipulation"), whereby it continued to provide

4    operating cash flow to the Debtor in bankruptcy.  This matter involves the Cash Collateral

5    Stipulation, the Court's order approving the Debtor's AFE-Pioneer Sale, and the Committee's

6    Sale Proceeds Objection.   The specific issue is whether the Debtor should be required to turn

7    over to CNB 87.5% of the AFE-Pioneer Sale proceeds as required by the Cash Collateral

8    Stipulation and sale order.

9            **A.      Cash Collateral Stipulation**

10           The Cash Collateral Stipulation includes as a key component of its bargained-for terms,

11   that the Debtor remit to CNB specified percentages of sales of CNB collateral, including 87.5%

12   of net sale proceeds of "Ownership Dispositions."  The AFE-Pioneer Sale is an "Ownership

13   Disposition" in which 87.5% of net sale proceeds of the Debtor's sale is required to be paid over

14   to CNB.  See Cash Collateral Stipulation, §§ 7(c)(ii) and 7(c)(iii).

15           **B.      Sale Motion; Committee Sale Objection; Sale Order**

16           On March 12, 2009, the Debtor filed a motion (Doc. 36) (the "Sale Motion") seeking

17   authority to sell certain assets, including in particular its partnership interest in AFE-Pioneer

18   Associates, LP ("AFE-Pioneer").  Consistent with the Cash Collateral Stipulation, the Sale

19   Motion sought authority for the Debtor to remit 87.5% of net sale proceeds of the AFE-Pioneer

20   Sale to CNB.  See Sale Motion at pp. 3-5.  On March 31, 2009, the Committee filed an objection

21   (Doc. 75) (the "Committee Sale Objection") by which the Committee objected to the payment to

22   CNB of proceeds of the sale of its collateral under the Sale Motion on the grounds, among others,

23   that the Committee had not had sufficient time to determine the validity and priority of CNB's

24   lien rights in the Debtor's assets and thus that payment of a portion of the sale proceeds to CNB

25   was inappropriate.  See Committee Sale Objection at pp. 2-3.  In addressing the Committee's

26   objection, the Court approved the sale of assets as sought by the Sale Motion, but the Court's

27   Order Granting Motion to Sell and Assign Partnership Interest, entered on April 9, 2009 (Doc.

28   93) (the "Sale Order") included the following provision:

Unless the Official Committee of Unsecured Creditors has filed a pleading in this case by April 23, 2009, asserting a defect in CNB's lien rights in the Debtor's interests in AFE-Pioneer (such assertion to be based on the merits and not on the basis of a lack of time or lack of information), then . . . the Debtor shall remit 87.5% of the sale proceeds to CNB.

## C. Committee Sale Proceeds Objection

The April 23, 2009 date stated in the Sale Order was extended by stipulation among CNB, the Debtor, and the Committee to May 5, 2009 (see the Court's Order approving the second such stipulation, Doc. 132). The Committee filed the Sale Proceeds Objection on the extended May 5, 2009 deadline when CNB declined to extend the date further. By filing the Sale Proceeds Objection, the Committee attempts to trigger the exception in the Sale Order to the general rule that sale proceeds are to be paid to CNB on account of its collateral, and to thwart CNB's receipt of the AFE-Pioneer Sale proceeds as required by the Cash Collateral Stipulation and the Sale Order. CNB is informed and believes that as of the date of this Motion, the AFE-Pioneer Sale has not yet closed, but upon the consummation of that sale, the Debtor can be expected to delay remittance of sale proceeds to CNB if the Sale Proceeds Objection remains pending and unresolved. CNB brings its Motion under the Cash Collateral Stipulation and Sale Order to compel payment of 87.5% of the AFE-Pioneer Sale proceeds and for an order that the Sale Proceeds Objection cannot be used to block remittance to CNB of its share of the AFE-Pioneer Sale proceeds.

## III. FACTS

Aside from whether an "authorized" person checked the termination boxes on the UCC3 financing statement amendments discussed more fully below, there is little or no disagreement between CNB and the Committee regarding the facts of CNB's original financing statement and the relevant amendments filed to consummate the Greenery and Westgate sales.

### A. Uncontested Facts

CNB and the Committee agree that CNB's security interest in the Debtor's personal property assets was originally perfected by the CNB Financing Statement filed in 2004. Although CNB does not agree with the Committee's conclusory and incorrect characterization of the two UCC3 financing statement amendments filed to effect the Greenery and Westgate sales

5

Case: 09-41727   Doc# 167   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 9 of
23
{J664\0009\00469893.DOC.v1}

as "termination statements," CNB does agree that the initial filing of the financing statement by CNB, and the dates and particulars of the various filed amendments to that statement, are all as set forth in the Sale Proceeds Objection and in the declaration of Maxim Litvak in support thereof ("Litvak Declaration"). Specifically, the relevant facts of this matter, with respect to which CNB and the Committee appear to be in agreement, are as follows:

1. On August 9, 2004, CNB filed the CNB Financing Statement with the California Secretary of State's Office. A true and copy of the CNB Financing Statement is attached as Exhibit A to the Declaration of Jerry McDermott in Support of Motion For Order Requiring Debtor To Remit Collateral Sale Proceeds To Secured Creditor City National Bank, filed concurrently herewith (the "McDermott Declaration"), and is also attached as Exhibit A to the Litvak Declaration. McDermott Declaration at ¶ 4.

2. In December of 2008, the Debtor advised CNB that the Debtor wished to consummate the sale of its general partnership interests in Westgate Housing Associates L.P. ("Westgate") and Greenery Housing Associates, L.P. ("Greenery"). On January 8, 2009, Richard Bell, the executive vice president of the Debtor, sent an email message to Jerry McDermott, a vice president of CNB, transmitting proposed UCC3 financing statement amendments to the CNB Financing Statement to release from the scope of CNB's security interest the Debtor's Westgate and Greenery partnership interests. Mr. Bell's email to Mr. McDermott contained as attachments two UCC3 financing statement amendments, one for the release of Westgate and the other for the release of Greenery, together with two proposed escrow instruction letters, again one for Westgate and the other for Greenery. McDermott Declaration at ¶¶ 5-6. True and correct copies of the email communication between Mr. Bell and Mr. McDermott and its attachments are attached, collectively, as Exhibit B to the McDermott Declaration, and as Exhibit B to the Litvak Declaration. McDermott Declaration at ¶ 6. Each of the instruction letters states, in pertinent part, as follows:

> [Subject to stated conditions]. . . City National Bank hereby releases all of its right, title and interest in the property described on Exhibit B and authorizes the filing of appropriate amendments to [the CNB Financing Statement].

In turn, Exhibit B of the Greenery version of the escrow instruction letter recited a description of

Case 09-41727    Doc# 157    Filed: 06/12/09    Entered: 06/12/09 17:04:29    Page 10 of 23

the Greenery partnership interest to be released from the scope of the CNB Financing Statement,

and Exhibit B of the Westgate version of the escrow instruction letter did likewise with respect to

the Westgate partnership interest collateral. See Exhibit B of the McDermott Declaration.

3. The UCC3 financing statement amendments provided by Mr. Bell to Mr.

McDermott also contained specific language describing the Greenery and Westgate collateral.

Specifically, in Box 8 of the financing statement amendment reflecting a "Collateral Change" the

Greenery financing statement amendment contained the following description:

> All of the right, title and interest of Debtor and Debtor's affiliates in and to cash flow and other distributions, capital profits and losses, tax credits and otherwise in and to Greenery Housing Associates, a California limited partnership, including but not limited to all allocations and distributions, all management, voting and other rights under any organizational and operational agreements, and all rights to any receivables related to The Greenery apartment project in Woodland, California, including but not limited to deferred development fees, management fees, incentive management fees, fees payable under any real service agreements (except for current liabilities (less than 30 days old) owed to Evans Property Management, Inc. in its capacity as property management aged [sic] for the Project), partnership service agreements, or real estate brokerage agreements, member loans, voluntary loans, operating deficit loans, development deficit loans, credit adjustment notes, refunds of taxes, insurance or any other overpayments made intentionally or unintentionally in any period prior to January 8, 2009, and any other such receivables.

The Westgate financing statement amendment contained identical, but conformed language.

CNB contends that, obviously, had there been any intention to actually terminate the

effectiveness of the CNB Financing Statement, none of this specific language would have been

necessary, and only one termination statement would have been required, and that CNB did not

intend to and did not authorize the termination of the CNB Financing Statement.

4. The proposed escrow instructions Mr. McDermott received from Mr. Bell were to

be returned to the two addressees: The Debtor in care of Mr. Bell, and Renee Stevensen of First

American Title Insurance Company (the "Escrow Agent"). After approving the form of the

escrow instructions and UCC3 financing statement amendments as delivered to him by Mr. Bell,

on January 8, 2009, Mr. McDermott signed the escrow instructions with their limited scope

Greenery and Westgate authorizations, and delivered those instructions and the enclosures of the

specifically limited Greenery and Westgate financing statement amendments to each of Mr. Bell

and the Escrow Agent, at the addresses set out in the instructions. McDermott Declaration

at ¶¶ 9-10.  The materials Mr. McDermott sent to Mr. Bell and the Escrow Agent consisted of: two versions of the escrow instructions (one for Greenery, one for Westgate) signed by Mr. McDermott, but in all other respects in exactly the form that Mr. Bell had sent them to him; and two versions of the financing statement amendments in exactly the form that Mr. Bell had sent to him, again one for Greenery and the other for Westgate.  CNB contends that, in neither the Greenery nor the Westgate amendments, did Mr. McDermott mark the termination boxes or make any other change to the financing statement amendments.  McDermott Declaration at ¶ 9.  True and correct copies of the escrow instruction letters in the form that Mr. McDermott sent them, and of the amendments which accompanied the escrow instruction letters, are attached, collectively, as Exhibits C and D to the McDermott Declaration, and are also attached as Exhibits C and D to the Litvak Declaration.  McDermott Declaration at ¶ 10.

5.    As can be seen from inspection of the UCC3 financing statement amendments, each of the financing statement amendments is properly formatted to effect a partial release of collateral from the broad scope of the CNB Financing Statement – each amendment has the "describe collateral deleted" box checked in the "Amendment (Collateral Change)" section of the amendment (Section 8 of the UCC3 amendment form), indicating an authorization to delete collateral, and each financing statement amendment includes a specific description of the collateral to be released in the appropriate space for the description of released collateral.  In one amendment the Greenery partnership interest is specifically described as set out in paragraph III.A.3, above; in the other amendment, the Westgate partnership interest is specifically described.  The amendments are consistent with the very narrow scope of the authority conveyed in the escrow instruction letters.  The amendments authorize the release of the specific Greenery and Westgate collateral, but nothing more.

6.    On January 28, 2009, two UCC Financing Statement Amendments (the "Filed Amendments") were filed with the Office of the California Secretary of State, and true and correct copies of the Filed Amendments are attached collectively as Exhibit E to the McDermott Declaration, and as Exhibit E to the Litvak Declaration.  McDermott Declaration at ¶ 14.  As can be seen from an inspection of the Filed Amendments, the "termination" box had been checked by

Case 09-41727   Doc# 157   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 12 of 23
{1664 | 0069 | 00469895.DOC v 1}

1   hand on each of the Filed Amendments (and CNB submits that these boxes were checked at some

2   time after Mr. McDermott had authorized their filing but prior to their filing with the California

3   Secretary of State, but otherwise the amendments remain the same, with the same narrow release

4   of the Greenery and Westgate collateral. On February 6, 2009, CNB filed one corrective

5   statement for each of the Filed Amendments for Greenery and Westgate (collectively, the

6   "Corrective Amendments"), true and correct copies of which are attached collectively as Exhibit

7   F to the McDermott Declaration, and as Exhibit G to the Litvak Delcaration. McDermott

8   Declaration at ¶ 15. Each of the Corrective Amendments includes a statement that the Filed

9   Amendments had not been authorized as termination statements and had been authorized solely

10  as partial collateral releases of the Greenery and Westgate collateral. See Exhibit F to

11  McDermott Declaration.

        **B.      Additional Facts.**

12          In addition to the above facts and those stated in the Sale Proceeds Objection as to which

13  the Committee and CNB agree, the following facts are not stated in the Sale Proceeds Objection

14  but may bear on the Court's consideration of CNB's Motion:

15          1.      CNB was not involved in any way with the selection of the Escrow Agent, did not

16  engage or employ the Escrow Agent, and has not had any contact whatsoever with the Escrow

17  Agent (either in writing or verbally) with regard to the filing of the Filed Amendments or the

18  Westgate sale or Greenery sale, other than Mr. McDermott's delivery of the escrow instructions

19  and their enclosures to Renee Stevensen as described above. McDermott Declaration at ¶ 12.

20          2.      Mr. McDermott was the sole employee of CNB who was involved with

21  authorizing the release from the CNB Financing Statement, of the Westgate and Greenery

22  partnership interests. The only modification authorized by Mr. McDermott was to release from

23  the scope of the CNB Financing Statement the Westgate and Greenery partnership interests. The

24  only manual mark made by Mr. McDermott on the documents delivered to him by Mr. Bell was

25  his signing of the escrow instructions. The only action taken by Mr. McDermott was the return

26  of the escrow instructions and financing statement amendments as set forth above. McDermott

9

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL
{1664 / 0069 / 00469893.DOC / V1}

1    Declaration at ¶¶ 2, 13. Except as set forth above and in the McDermott Declaration, and other

2    than communications with CNB's legal counsel regarding the legal effect of Mr. Bell's January

3    8, 2009 e-mail message and its attachments, Mr. McDermott had no communication (written or

4    verbal) with Mr. Bell, anyone else at the Debtor, or any other person regarding the Filed

5    Amendments, either generally, or specifically in respect of the manual check marks in the

6    termination boxes on the Filed Amendments. McDermott Declaration at ¶ 13. In sum, Mr.

7    McDermott did not authorize the Escrow Agent, the Debtor, or any other person to alter the

8    financing statement amendments he had sent to the Escrow Agent. In particular, Mr. McDermott

9    did not authorize anyone to check the termination boxes on the Greenery and Westgate

10   amendments prior to filing them. McDermott Declaration at ¶ 13.

11        3.       CNB became aware that the Filed Amendments contained an unauthorized manual

12   check of the termination boxes on or about February 6, 2009, while performing a routine search

13   of the Secretary of State records to determine whether a further financing statement amendment

14   releasing the Debtor's "Coventry" partnership from the scope of the CNB Financing Statement

15   had been filed. In response, CNB authorized its legal counsel to file the Corrective Statements

16   with respect to those amendments, and CNB's counsel did so on February 6, 2009. McDermott

17   Declaration at ¶ 15.

18   **IV.    ARGUMENT**

19        CNB does not disagree with the Committee's recitation of facts, but vehemently objects

20   to its unsupported conjecture of what occurred after CNB submitted the properly-formatted

21   Greenery and Westgate financing statement amendments to the Debtor and to the Escrow Agent.

22   The Committee speculates that because "[it] does not know" the circumstances of how the

23   termination boxes got checked on the UCC3 financing statement amendments, it must conclude

24   that an *authorized* person checked the termination boxes, and also must conclude that the Escrow

25   Agent was an "authorized agent" of CNB for purposes of terminating the CNB Financing

26   Statement. The documentary facts clearly illustrate just the opposite of what the Committee

27   asserts– that CNB did not authorize anyone to check the termination boxes on the UCC3

28   financing statement amendments of the CNB Financing Statement. The Filed Amendments,

10

Case 09-41727   Doc # 167   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 14 of
23

therefore, were **not** authorized to be filed as termination statements as a matter of fact, and were ineffective as such, as a matter of law.

### A. An Unauthorized Filing is Ineffective Under UCC Section 9-510

When "Revised Article 9" of the Uniform Commercial Code became effective in California on July 1, 2001 (Cal. Comm. Code §§ 9101, *et seq.*) the statute included a new substantive provision which specifically provides that only statements filed by an "authorized" person are effective. California Commercial Code Section 9510(a) provides in pertinent part that "[a] filed record is effective only to the extent that it was filed by a person that may file it under Section 9509 ." Cal. Comm. Code § 9510(a). Section 9509(d) of the California Commercial Code, in turn, provides that "[a ] person may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement **only if . . . [t]he secured party of record authorizes the filing .** . . ." Cal. Comm. Code § 9509(d) (emphasis added).

Under California law unauthorized filings are simply ineffective. See Official Comment 3, Uniform Commercial Code Section 9-502 ("Of course, a filing has legal effect only to the extent it is authorized. See Section 9-510"). Moreover, as is clear from the text of Section 9510 , a filing which was authorized but which exceeds the authority granted by the party authorizing the filing (as is the case here), is effective only "to the extent" it was authorized. One treatise discusses this "to the extent" language of the applicable Uniform Commercial Code Section 9-510(a), as follows:

> Revised Section 9-510(a) also addresses a related, but distinct, problem. What is the status of a record that was filed by a person entitled to file by revised Section 9-509 but the content of which goes beyond that which was authorized? . . . Revised Section 9-510(a) provides that a filed record is effective *only to the extent* that it was filed by a person entitled to do so under revised Section 9-509. As the comment makes clear, the "only to the extent" language is present to nullify records to the extent that they go beyond the actual or deemed authorization that entitled the filer to file them**.**

9B Hawkland's Uniform Commercial Code Series (West 2001), at pp. Rev. Art. 9-794 – Rev. Art. 9-795, §9-509:4.

Similarly, the California Secretary of State's Office's acceptance of the Filed

11

Amendments for filing does not alter the fact that an unauthorized filing is ineffective. Acceptance for filing is largely irrelevant in the filing system of Revised Article 9. Under California Commercial Code Section 9520(b), filing officers have very limited discretion regarding the acceptance of records for filing; filings cannot be rejected other than for the limited reasons set forth in Section 9516(b) (none of which are applicable here). See Cal. Comm. Code §§ 9516(b) and 9520(b). See also Official Comment 2, Uniform Commercial Code Section 9-520 ("Under this section, the filing office is not expected to make legal judgments and is not permitted to impose additional conditions of requirements"); Official Comment 3, Uniform Commercial Code Section 9-502 ("[T]he filing office is neither obligated nor permitted to inquire into issues of authorization"). Indeed, the electronic filing system that has been in effect since Revised Article 9 became the law contemplates an "open drawer" policy where virtually all filings related to an initial financing statement are accepted without manual signature and without question. To the extent that a party affected by a filing disagrees with or disputes the content of a subsequent filing, they can, as CNB did in this case, file a subsequent corrective or clarification filing to correct any confusion in the record. In this case, CNB's Corrective Statements clarify what is already clear from the face of the Filed Amendments: The Filed Amendments relate solely to the release of Greenery and Westgate from the scope of the CNB Financing Statement.

**B.  An Escrow Agent's Authority is Limited by Its Instructions.**

The Committee further speculates that the Escrow Agent was a double agent who may have been working for CNB. Thus, any alteration by the Escrow Agent of the UCC3 financing statement amendments that CNB authorized the filing of, must be held against CNB. The Committee's objection seems to reason that the actual authority of an escrow agent includes everything that is ***more or less*** within the scope of an agent's authority, even when those actions are clearly inconsistent with the limited authority given to the escrow agent by clearly and narrowly-drawn instructions. If the law were as the Committee suggests, escrows would simply cease to have any meaningful function in California transactions. No party would deliver documents to escrow pursuant to written instructions if the written instructions could not be relied upon to establish the parameters of what the escrow agent is actually authorized by the

12

principal to do. As a matter of California agency law, however, the law is the opposite of what the Committee would have it – under California law, escrow agents are held to a strict standard of performance. Todd v. Vestermark, 145 Cal.App.2d 374, 377, 302 P.2d 347, 349 (Cal.App.2.Dist., 1956); Watts v. Mohr, 86 Cal.App.2d 256, 262, 194 P.2d 758 (Cal.App.2.Dist., 1948). The Watts Court stated as follows:

> It is aptly stated in 19 American Jurisprudence, page 438, section 20: "In the law governing performance of escrow agreements, there is no doctrine of substantial compliance to be found. Compliance must be full and to the letter, or else it constitutes merely noncompliance . . . ."

Moreover, unauthorized actions by escrow agents are void and of no force or effect. Greenzweight v. Title Guarantee & Trust Co., 1 Cal.2d 577, 581, 36 P.2d 186 (1934) (citation omitted) ("The law is well established that a delivery by an escrow agent contrary to the terms of a deposit in escrow is void and of no force or effect") (citation omitted). Compare Todd v. Vestermark, supra, 145 Cal.App.2d at 377, 302 P.2d at 349 ("[A] delivery or recordation by or on behalf of the escrow holder prior to full performance of the terms of the escrow is a nullity . . . ."). In the case of Montgomery v. Bank of America Nat. Trust & Savings Ass'n, 85 Cal.App.2d 559, 193 P.2d 475 (Cal.App. 2 Dist. 1948), the Court addressed a situation involving an escrow agent who had altered the property description on a deed that had been delivered into escrow, without the authority of the grantor to do so. In holding that the unauthorized alteration was ineffective, the Court stated as follows:

> Since the deed was altered without the knowledge, consent or approval of plaintiffs, after it had been signed by them and transmitted to the escrow holder, it was void . . .
>
> . . .
>
> It is not necessary to discuss the question whether an escrow holder is an agent or trustee. In whatever capacity defendant was acting it was without authority to deliver the deed to the grantees covering the entire lot . . . . A principal is not bound by the unauthorized act of his agent unless he had knowledge of the agent's violation of his authority.

Id., 85 Cal.App.2d 559 at 563-64, 193 P.2d at 477-78 (citations omitted).[2]

---

[2] The California Civil Code sets forth provisions of general applicability to agents (not just escrow agents), and is

13

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL
Case 09-41737   Doc# 157   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 17 of 23

{1664 | 0069 | 0046989S.DOC;V1 }

1    In his 2006 article, <u>Effect of a UCC-3 Financing Statement Where Both the Amendment</u>

2    <u>and Termination Boxes Are Checked</u>, published at http://www.firstam.com/content.cfm?id=3236

3    (2006) ("<u>Murray</u>"), John C. Murray directly addresses an escrow agent's lack of authority in the

4    very context of the unauthorized checking of termination boxes on UCC collateral releases.

5    Addressing the question of the effectiveness under §§ 9-509(d) and 9-510(a) of Revised Article 9

6    of an unauthorized checking of the termination box on an amendment intended merely as a

7    partial collateral release, <u>Murray</u> discusses the authority of an escrow agent in this context as

8    follows:

> Under the law of agency in Delaware and in most other states, an agent has actual authority to conduct a transaction on a principal's behalf only where the principal grants the agent the authority to conduct the transaction. An agent's authority to conduct a transaction may be either express or implied. There is no express authority where there are no facts indicating the lender explicitly granted the escrow officer or agent the authority to file an amendment terminating the effectiveness of the original financing statement. And there can be no implied authority where the only communication between the lender and the escrow officer or agent contains explicit directions to file the Amendment deleting certain specified collateral as indicated in the collateral description attached to the Amendment, thereby impliedly prohibiting the escrow agent or officer from filing an amendment terminating the original financing statement as to the remaining collateral.

17   The agency cases cited by the Committee simply do not apply in the present context. The

18   case of <u>Morrow Crane Company v. Affiliated FM Insurance Company</u>, 885 F.2d 612, 615

19   (9th Cir. 1989) cited by the Committee, for example, involved "apparent" or "ostensible"

20   authority of an agent – a third party could rely on the seeming authority of an agent to have

21   cranes shipped above deck, even though the agent's actual authority was limited to having the

22   cranes shipped below deck. But the concept of "apparent" or "ostensible" authority" doesn't

23   apply in the context of UCC filings under Revised Article 9. There is no third party who might

24   be said to have relied on the "apparent" authority of the escrow agent who caused the Filed

---

26   consistent with the foregoing. Thus, under Civil Code Section 2319, an agent "has authority "[t]o do everything
27   necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency . . .", but under Civil Code Section 2320, an agent "has power to disobey instructions" of the agent's principal *only* "where it is clearly for the interest of his principal that he should do so, and there is not time to communicate with the principal."

28

Case 09-41727   Doc# 157   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 18 of
23

Amendments to be delivered to the Secretary of State in this case.  The effectiveness of the filing is keyed directly to the scope of authority that CNB intended the filing to have as the person authorizing the record to be filed.  To the extent that the Filed Amendments were not authorized, they have no legal effect at all.  The parties to the Greenery-Westgate transaction could very clearly see the limited scope of the escrow agent's authority and could in no way have been misled to rely on anything beyond that limited authority.  The Secretary of State's Office, which accepted the Filed Amendments for filing, was not even in a position to mistakenly rely on the "apparent" authority of the filer since the authority of the filer is inapplicable under Section 9509(d) (filing offices have no discretion to reject filings based on the authority or lack thereof. Cal. Comm. Code §§ 9516(b), 9520).  See also Murray, supra  ("The doctrine of "apparent authority" does not apply, because this is really no authority at all; it is merely an estoppel-like doctrine . . . [that] is irrelevant for the purposes of § 9-509(d).")  There is nothing in section 544 of the Bankruptcy Code that changes this.

The 1936 conversion case cited by the Committee, Goddard v. Metropolitan Trust Co. of California, 82 F.2d 902 (9th Cir. 1936), is equally inapplicable, because the issue in that case was not whether the actions of the agent were effective or authorized (the actions *had* exceeded the agent's authority) but rather, whether the agent's actions would support a cause of action against the agent for conversion rather than merely an action for damages, the significance apparently being the measure of damages to which the principal might be entitled.  Id. at 904.

In sum, California agency law does not support the Committee's position that the unauthorized actions of an escrow agent in checking the termination boxes on the Filed Amendments should be deemed to have been "authorized" for purposes of California Commercial Code Sections 9509 and 9510.  The Committee's suggestion otherwise is just plain wrong.  The cases cited by the Committee do not alter the clear result under California law:  CNB did not authorize the checking of the termination boxes on the Filed Amendments and, accordingly, the Filed Amendments were not effective as termination statements, as a matter of law, under Sections 9509 and 9510a of the California Commercial Code.

## C. A Financing Statement Amendment with Both the Termination Box Checked and a Collateral Amendment Box Checked Does Not Automatically Constitute a Termination Statement.

For the sake of argument, even if the Court *were* to decide that, despite the limiting language of the escrow instructions, and the limiting language of the UCC3 financing statement amendments themselves, the Escrow Agent was "authorized" for purposes of Section 9510(a) of the California Commercial Code to check the termination boxes on CNB's UCC3 financing statement amendments, the erroneous filing of the Filed Amendments with the termination boxes checked would nonetheless be ineffective to terminate CNB's Financing Statement. Where, as here, both the "termination" box and a collateral amendment box are checked, the resulting financing statement amendment is inconsistent on its face, and clearly conveys to parties reviewing the public record that a partial release of collateral was intended rather than a termination. At a minimum, a financing statement amendment with both the termination box and partial release box checked puts parties on inquiry notice that a collateral release *may* have been intended rather than a termination. For this reason, the erroneously-checked termination boxes should be viewed as "minor errors" and as not "seriously misleading" errors for purposes of Section 9506(a) of the California Commercial Code. That Section provides that filings are effective even if they have minor errors or omissions, unless the errors or omissions make the filing "seriously misleading." Murray observes, were both boxes to be checked:

> . . . [T]he Amendment would not constitute a termination statement because it contained only a minor error that did not render the original financing statement, together with the Amendment, seriously misleading. This is so because both the amendment (partial release) and termination boxes were checked, and a lengthy description of the portion of the collateral that was to be deleted from the coverage of the original financing statement was attached. At most, there was only a "minor error" that did not cause the financing statement to become so seriously misleading so as to become ineffective as to all of the collateral.

Murray, *supra*.

CNB acknowledges that on very different facts the Ninth Circuit decision cited in the Committee's objection, Koehring Company v. Nolden (In re Pacific Trencher & Equip., Inc.), 735 F.2d 362 (9th Cir. 1984), reached the opposite conclusion and determined that it *would* be

---

16

1  seriously misleading not to give effect to the inadvertently checked "termination" box involved in

2  that case. However, that case does not compel the same result here.  First, Koehring was decided

3  before the adoption of Revised Article 9, and before Section 9509(d) focused exclusively on the

4  secured party's authorization of the filing.  In addition, the Koehring case is distinguishable

5  because it involved a very different fact pattern.  In that case, *only* the "termination" box was

6  checked on the financing statement amendment and the secured party argued that the amendment

7  was intended as a partial release.  Id. at 363.[3]  Here, the Committee must concede that it is not

8  that the *wrong* box was checked to the exclusion of the correct box.  Instead, *both* were checked.

9  This leads to a different result.

10       In Koehering, the Court first observed that the underlying inquiry regarding whether an

11  error in a financing statement is "seriously misleading" is the question of "'whether it would

12  indicate to an interested third party the possible existence of prior encumbrances on the

13  collateral.'"  Id. at 364 (quoting from In re Munger, 495 F. 2d 511, 512 (9th Cir. 1974)).  The

14  Court then went on to find that, in a case where only the termination box had been checked, the

15  text associated with the termination box was "unambiguous as a matter of law" and that there was

16  "no possibility of construing a partial termination of items listed in a financing statement."  Ibid.

17  In the present case, however, the financing statement amendments were *not* unambiguously

18  termination statements because both the termination and amendment boxes were checked.  The

19  test from Koehring – whether the Filed Amendments "would indicate to an interested third party

20  the possible existence of prior encumbrances on the collateral" is satisfied for two reasons:  First,

21  the collateral release boxes were checked *in addition to the* erroneously-checked termination

22  boxes.  Second, the "Amendment (Collateral Change)" section contained specific descriptions of

23  the Greenery and Westgate collateral that was being carved out from the scope of the broad form

---

[3] Other decisions cited by the Committee regarding the effect of termination statements, to the extent that the facts can be discerned from the reported decisions, likewise did not involve amendments that did not on their face appear to be both partial releases and terminations.  See, e.g., Crestar Bank v. Neal (In re Kitchen Equip. Co. of Virginia), 960 F.2d 1242, at 1247 (4th Cir. 1992) (involved only the "termination" box, and "partial release of collateral" box was not checked); In re Silvernail Mirror and Glass, Inc., 142 B.R. 987, 988 (Bankr. M. D. Fla. 1992) (amendment merely stated that creditor "no longer claims a security interest under the . . . Financing statement . . . .")

filing  The Filed Amendments do significantly more than indicate the "possible existence" that CNB's liens were not being terminated.  Any reasonable searcher would conclude that the Filed Amendments, with specific descriptions of collateral being released, and both the "release" and "termination" boxes checked, were not intended as terminations but merely partial releases.  At a minimum, the inconsistencies on the face of the Filed Amendments would have put persons on notice to make inquiry of CNB as to whether CNB had authorized the termination of the CNB Financing Statement.[4]  The fact that *two* UCC amendments had been filed further provides inquiry notice to subsequent searchers that releases of collateral were intended and not terminations, for the simple reason that a financing statement can only be terminated once.  Had CNB authorized the termination of the CNB Financing Statement in the first instance, it would have been pointless for CNB to authorize the termination of the CNB Financing Statement a second time.

The Koehring case is also distinguishable because it is a *pre*-Revised Article 9 case.  By adopting Revised Article 9 in 2001, the Uniform Commercial Code (and the California Commercial Code) was revised to include new provisions effectively putting UCC filings more on an "honor system" than had previously been the case, removing discretion from filing offices with regard to the acceptability and effectiveness of records that are submitted to them for filing, and vesting the parties with a greater role in establishing the filing record and, where appropriate, making inquiry into the effectiveness of filings appearing of record.  Thus, California Commercial Code Section 9520(b), discussed above, divests filing offices of the discretion to reject filings submitted to them, except on limited grounds; Section 9502 omits the previous requirement that filings be signed; Sections 9509 and 9510 clarify who may file certain types of filings and what the effect is of inappropriate or unauthorized person causing a filing to be made (they are ineffective to the extent of the lack of authority); and Section 9518 permits a correction

---

[4] This is all more true when one considers that CNB promptly filed the Corrective Statements just 8 days after the filing of the Filed Amendments, and when one considers that the Filed Amendments entailed the filing of *two* UCC amendments, not one – if terminations had actually been intended, there would have been no need for two termination statements.  One filing is enough if it is intended to terminate a financing statement.

18

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL
{1664 | 0069 | 00469895.DOC V1}

Case 09-41737   Doc# 157   Filed: 06/12/09   Entered: 06/12/09 17:04:29   Page 22 of 23

1  statement to be filed if the debtor disagrees with the record.  Although the Court does not even

2  need to apply <u>Koehring</u> in this case because of the significantly different facts when each of the

3  financing statement amendments contains indications that it is both a termination and an

4  amendment, the continued applicability of <u>Koehring</u> is doubtful in light of the subsequent

5  adoption of Revised Article 9.

6  **V.      CONCLUSION**

7          The CNB Financing Statement continues to perfect CNB's security interest in the broad

8  description of collateral contained therein.  That description includes the AFE-Pioneer

9  partnership interest that the Court has authorized the Debtor to sell, subject to the Debtor's

10  obligations to CNB.  CNB respectfully requests that the Court enter an Order authorizing and

11  directing the Debtor to remit to CNB the 87.5% of the AFE-Pioneer sale proceeds, and for such

12  other and further relief as to the Court appears appropriate.

13

14  Dated:  June 12, 2009                    PEPLER MASTROMONACO LLP

15

16                                           By:  ___/s/ Frank T. Pepler_____

17                                                FRANK T. PEPLER
                                                 Attorneys for City National Bank

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION OF CITY NATIONAL BANK FOR ORDER
REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

{1664 | 0069 | 00469895.DOC V1}