FRANK T. PEPLER (SBN 100070)
T. SCOTT BUCEY (SBN 202657)
PEPLER MASTROMONACO LLP
100 First Street, 25th Floor
San Francisco, CA 94105
Telephone: (415) 978-9860
Facsimile: (415) 978-9862

Attorneys for City National Bank

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **In re** | **Case No. 09-41727 EDJ** |
| **A.F. EVANS COMPANY, INC.,** | **Chapter 11** |
| Debtor. | **DECLARATION OF JERRY MCDERMOTT IN SUPPORT OF MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL** |
| | **Judge Jellen** |
| | **Hearing Date: July 2, 2009**<br>**Time: 2:30 p.m.**<br>**Ctrm: 215** |

I, Jerry McDermott, declare as follows:

1. I am a Vice President of City National Bank, N.A. ("CNB"), a national banking association, in CNB's offices located at 555 South Flower Street, Los Angeles, California 90071. The following facts are true of my own personal knowledge. If called upon to testify as a witness, I could and would testify competently to the facts hereinafter set forth.

2. I am the CNB loan officer with authority over the files regarding and relationship with A.F. Evans Company, Inc. (the "Debtor"). I maintain the CNB files regarding the Debtor in the

1

DECLARATION OF JERRY MCDERMOTT IN SUPPORT OF MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727  Doc# 168  Filed: 06/12/09  Entered: 06/12/09 17:20:57  Page 1 of 8

normal course of my duties as a Vice President of CNB and I maintain, or oversee the maintenance of the CNB files regarding the Debtor consistent with the standard practices and procedures of CNB. Prior to my taking responsibility for the maintenance of CNB's files related to the Debtor, those files were maintained in the normal course of CNB's business and consistent with the standard practices and procedures of CNB. I am making this declaration in support of the Motion of City National Bank for Order Requiring Debtor to Remit Sale Proceeds of Collateral filed in the Debtor's bankruptcy case ("Motion"). I am the only loan officer or other person within CNB who has been involved in any pertinent way with the matters set forth in this Declaration and, in particular, with regard to the Uniform Commercial Code financing statement amendments which are discussed below and which are the subject of the Motion. The facts concerning the scope of authority that I gave with respect to amendments to the financing statements perfecting CNB's security interest in the Debtor's assets is set forth below. Conversely, the facts concerning the <u>un</u>authorized filing of UCC amendments by an unknown third party with the "termination" boxes checked are also set forth below. The lack of authorization for any party to file a UCC amendment with the termination box checked is the subject of the Motion.

3. I have reviewed the "Objection of Official Committee of Unsecured Creditors to Distribution of Sale Proceeds to City National Bank" filed by the Official Unsecured Creditors' Committee in the Debtor's bankruptcy case on May 5, 2009, and the declaration of Maxim Litvak filed in support thereof ("Litvak Declaration"). I have also reviewed the Motion, which sets out CNB's position in response to the Creditors Committee's objection and the Litvak Declaration.

4. Based on my review of CNB's files and on the official records of the California Secretary of State, on August 9, 2004, CNB filed a Uniform Commercial Code ("UCC") financing statement (the "CNB Financing Statement") in the Office of the California Secretary of State. A true and copy of the CNB Financing Statement, as filed, is attached hereto as <u>Exhibit A</u>, and is also attached as <u>Exhibit A</u> to the Litvak Declaration.

5. The CNB Financing Statement perfected the security interest granted by the Debtor in essentially all personal property of any kind or nature in which the Debtor held an

2

interest, among which were any general or limited partnership interest that the Debtor may have had in partnerships that held real estate assets that had been developed by the Debtor of its affiliates and/or which were managed by the Debtor or its affiliates. In December of 2008, I learned that the Debtor's plans to sell its general partnership interests in Westgate Housing Associates L.P. ("Westgate") and Greenery Housing Associates, L.P. ("Greenery"), long projected by the Debtor, might soon come to fruition. In connection with the anticipated sale of those interests (collectively, the "Westgate-Greenery Sale"), CNB and the Debtor reached an agreement with regard to the terms upon which CNB would consent to the Westgate-Greenery Sale. CNB agreed to release from the scope of the CNB Financing Statement, its rights in respect of Westgate and Greenery, and to permit the Westgate-Greenery Sale to go forward, provided that CNB would receive $37,500 of the sale proceeds of the sale of Westgate and $37,500 of the sale proceeds of the sale of Greenery ($75,000 in the aggregate). This reflected a substantial concession by CNB, because, pursuant to the Forbearance Agreement between CNB and the Debtor (discussed more fully in the Cash Collateral Stipulation between the Debtor and CNB, filed in the Debtor's bankruptcy case), CNB would have been entitled to receive 75% of the sale proceeds, and I was advised by the Debtor that the proceeds of the Westgate-Greenery Sale were to have been approximately $875,000. In addition to the $75,000 in sale proceeds that would be released directly to CNB in exchange for its release from the scope of the CNB Financing Statement of the Westgate and Greenery partnership interests, the Debtor agreed to use a portion of the excess sale proceeds to be received by the Debtor to cure interest arrearages in the Debtor's obligations to CNB.

6. I had general communications with Mr. Bell and others at the Debtor with regard to the Westgate-Greenery Sale and the proceeds of sale that would be paid to CNB in exchange for the release by CNB from the scope of the CNB Financing Statement of its security interests in Greenery and Westgate. However, the first (and, I believe, only) specific communication I had with anyone concerning the proposed mechanics of the release of Westgate and Greenery from the scope of the CNB Financing Statement to permit the Westgate-Greenery Sale to be free and

3

clear of CNB's security interest, or regarding the form of documentation to be used in connection with the releases required by the Debtor and the proposed Westgate-Greenery sale, was by way of an email, and attachments, from Mr. Bell dated January 8, 2009. By that message, Mr. Bell attached (i) two proposed UCC amendments related to the CNB Financing Statement, one of which referred to the partial release by CNB from the scope of the CNB Financing Statement of the Westgate partnership interest, and the other of which referred to the partial release by CNB from the scope of the CNB Financing Statement of the Greenery partnership interest, and (ii) two counterparts of proposed escrow instructions with respect to the delivery of such releases into escrow, one counterpart for Westgate and the Westgate UCC release and the other counterpart for Greenery and the Greenery UCC release. True and correct copies of Mr. Bell's January 8, 2009 email and of its attachments are attached hereto, collectively, as <u>Exhibit B</u>. True and correct copies of these attachments, and a copy of a materially identical variation of the e-mail message itself, are also attached, collectively, as <u>Exhibit B</u> to the Litvak Declaration.

7. The escrow instructions and enclosures that Mr. Bell sent to me were to be returned to Renee Stevensen, First American Title Insurance Company, 1737 North First Street, Suite 100, San Jose, California 95112 as well as to Mr. Bell. CNB had no input and no influence regarding establishing an escrow for the Westgate-Greenery transactions at First American Title Insurance Company. The escrow was established by the Debtor or by the purchaser of the Westgate-Greenery partnership interests prior to preparation by the Debtor of the escrow instructions and enclosures that I was provided by Mr. Bell. Prior to receiving the escrow instructions and enclosures from Mr. Bell, I had never heard of Renee Stevensen, had never had any contact with Renee Stevensen, had never engaged Renee Stevensen as an escrow agent in these or in any other transactions. Other than the transmission to Renee Stevensen of the escrow instructions and enclosures that I received from Mr. Bell, I have had no contact with Ms. Stevenson regarding the Greenery-Westgate sales or the UCC amendments that I delivered to her with my escrow instructions.

8. Upon receiving the proposed escrow instructions and UCC amendments from Mr.

Bell I forwarded them to counsel for review. I confirmed with counsel my understanding that the UCC amendments that I received from Mr. Bell were sufficient to release from the scope of the CNB Financing Statement CNB's security interests in the Greenery and Westgate partnership interests being sold. I also confirmed my understanding that the escrow instructions pursuant to which the UCC amendments were to be transmitted authorized the escrow to file the UCC amendments only when the escrow held for the benefit of CNB $37,500 each for the Greenery and Westgate sales. Because only the "amendment" boxes of the UCC amendments were checked, and because the description of collateral to be released was limited in one case to the Greenery partnership interest and in the other case to the Westgate partnership interest, I did not seek or receive advice concerning the effect of checking both the "amendment" box and the "termination" box on the UCC amendments.

9. The proposed escrow instructions that I received from Mr. Bell were addressed to the Debtor, care of Mr. Bell, and to Ms. Stevensen of First American Title Insurance Company. After confirming my understanding of the legal effect of the UCC amendments, I caused each of the Greenery and Westgate packages to be sent to Mr. Bell and to Ms. Stevensen in anticipation of the closing of the Greenery-Westgate Sales. The materials that I caused to be sent to Mr. Bell and Ms. Stevensen consisted of the two sets of escrow instructions, one for Greenery and the other for Westgate signed by me, but in all other respects in exactly the form that Mr. Bell had sent them to me. The materials that I caused to be sent to Mr. Bell and Ms. Stevensen also included the UCC financing statement amendments, in exactly the form that Mr. Bell had previously sent to me, each marked as an "amendment" and describing with particularity the Greenery partnership interest and the Westgate partnership, respectively, to be released from the scope of the CNB Financing Statement. Neither the Greenery nor the Westgate UCC amendment that I caused to be delivered had the "termination" box checked in addition to the "amendment" box.

10. I caused the each of the Greenery and Westgate packages to be sent by delivering the escrow instructions, signed in the form provided to me by Mr. Bell, and the unsigned UCC

5

amendments, in the form provided to me by Mr. Bell, to the three administrative assistants who support the CNB Special Assets group with whom I work. I do not have a specific administrative assistant assigned to support me, and instead the entire Special Assets group shares the three administrative assistants to whom I delivered the Greenery and Westgate packages. I asked the administrative assistants to deliver the Greenery and Westgate packages to Mr. Bell and to Ms. Stevensen, each at their respective addresses designated on the instructions, by depositing each of the packages into the United States Postal Service Mail, consistent with CNB standard policies and practices. After I delivered the Greenery and Westgate packages to the administrative assistants, I had no further contact with Ms. Stevensen regarding the closing of the Greenery-Westgate sales. I did subsequently receive confirmation by Mr. Bell that the sales closed on or about January 16, 2009, and I received the $75,000 release payments by wire transfer initiated by First American Title Insurance Company. True and correct copies of the instruction letters (identical to those I had received from Mr. Bell, except that I had signed them) are attached hereto, collectively, as Exhibit C, and are also attached as Exhibit C to the Litvak Declaration. True and correct copies of the financing statement amendments in the form that I enclosed them with these deliveries (again, identical in form to those that Mr. Bell had sent to me and which are attached hereto as Exhibit B, and without the termination boxes checked or any other alteration) are attached hereto again as Exhibit D, and are also attached as Exhibit D to the Litvak Declaration.

11. As indicated above, I caused the foregoing materials to be sent to Mr. Bell and to Ms. Stevensen as described in Paragraph 10 above by delivering the same to one of the administrative assistants that support the Special Assets group, and instructing that these materials be delivered to the addresses designated. The job functions of the administrative assistants are limited strictly to secretarial services such as typing, copying and mailroom services and do not permit or require any editing or modifying of my work product. Without limiting the foregoing, the administrative assistants who support the Special Assets group are not authorized to perform for me, or for any other employee of CNB, services involving the

preparation or processing of UCC financing statements or amendments, much less, the alteration or modification of any such materials prepared by others, and in fact do not perform such tasks. I do not recall, and my administrative assistants have advised me that they do not recall, which of them handled the delivery of these materials – nor would I expect anyone to remember the specifics of a routine delivery task. Nevertheless, without regard to the specific identity of the administrative assistant who assisted me in the delivery of these materials, based on my ordinary and customary business practices and those of my administrative assistants, I have absolutely no reason to suspect that the versions of the financing statement amendments that I delivered to Mr. Bell and to Ms. Stevensen would have been altered before they left CNB to include the checking of the termination boxes on the UCC amendments.

12. CNB was not involved in any way with the selection of the escrow agent, has not engaged or employed the escrow agent, and has not had any contact whatsoever with the escrow agent (either in writing or verbally) with regard to the filing of the subject financing statement amendments or the Westgate-Greenery Sale, except for my delivery of the escrow instructions and their enclosures as described in Paragraphs 6 and 7 above.

13. Except as set forth herein, and other than communications with CNB's legal counsel regarding the appropriateness of Mr. Bell's January 8, 2009 e-mail message and its attachments, I had no communication (written or verbal) with Mr. Bell, anyone else at the Debtor, or any other person regarding the subject financing statement amendments, either generally, or regarding specifically the checking of the termination boxes on the amendments. In sum, I did not authorize the escrow agent or any other person to alter the financing statement amendments I sent to the escrow agent and, in particular, I did not authorize anyone to check the termination boxes on those amendments prior to the filing of them.

14. On or about February 6, 2009, I learned from CNB's legal counsel that on January 28, 2009, two UCC financing statement amendments referencing the CNB Financing Statement had been filed with the Office of the California Secretary of State, and that the filed amendments had the "termination" boxes checked but were otherwise in the form I had delivered into escrow

for the Greenery-Westgate transactions. Counsel advised me that he had located these termination statements after conducting a routine post-filing search to confirm the filing of another amendment to the CNB Financing Statement concerning the "Coventry" partnership interest. True and correct copies of the amendments, in the form that they appear in the Secretary of State's public records, are attached hereto, collectively, as Exhibit E, and are also attached to the Litvak Declaration, collectively, as Exhibit E.

15. In order to correct the official record of the Secretary of State regarding the CNB Financing Statement and the unauthorized filing of the UCC amendments for Greenery and Westgate which included not only the checked "amendment" box and a specific description of the released Greenery and Westgate collateral, but also contained checked "termination" boxes, I authorized CNB's legal counsel to file two additional UCC financing statement amendments. Counsel filed such corrective statements on February 6, 2009 filed they are attached hereto, collectively, as Exhibit F, and are also attached to the Litvak Declaration, collectively, as Exhibit G.

I declare under the penalty of perjury and the laws of the state of California that the foregoing is true and correct.

Dated: June 11, 2009          /s/Jerry McDermott_____
                              JERRY MCDERMOTT, Declarant

8

DECLARATION OF JERRY MCDERMOTT IN SUPPORT OF MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL