Maxim B. Litvak (CA Bar No. 215852)
Pamela E. Singer (CA Bar No. 224758)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
E-mail: mlitvak@pszjlaw.com
psinger@pszjlaw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| In re: | Case No.: 09-41727-EDJ |
| A.F. Evans Company, Inc., | Chapter 11 |
| Debtor. | **OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL** |
| | **Hearing:** |
| | Date: July 2, 2009<br>Time: 2:30 p.m.<br>Place: Courtroom 215<br>1300 Clay Street, Suite 300<br>Oakland, CA 94612<br>Judge: Honorable Edward D. Jellen |

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

06238-002\DOCS_SF:65985.6

Case: 09-41727  Doc# 180  Filed: 06/25/09  Entered: 06/25/09 16:34:37  Page 1 of 17

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. KNOWN AND UNDISPUTED FACTS ..................................................................... 3

III. UNKNOWN FACTS ..................................................................................................... 4

IV. ARGUMENT ................................................................................................................. 5

    A. The Filing of the Terminating Amendments was Within the Scope of First American's Authority and is Binding on CNB ........................................................... 5

    B. CNB is Bound by Any Mistakes that May Have Been Made by Its Agent, First American, Acting Within the Scope of Its Authority .......................................... 6

    C. The Escrow Agent Cases Cited by CNB Substantiate the Point that an Agent's Mistakes Bind the Principal ........................................................................................ 8

    D. The Terminating Amendments (Even if They Contained Mistakes) were Effective in Terminating CNB's Security Interests Against the Assets of this Estate .............. 10

    E. The Committee Should Have an Opportunity to Conduct Discovery and Litigate the Validity, Priority or Extent of CNB's Asserted Liens Through an Adversary Proceeding ................................................................................................................ 13

V. CONCLUSION ............................................................................................................ 14

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

i
00238-002\DOCS_SF:65985.6

Case: 09-41727   Doc# 180   Filed: 06/25/09   Entered: 06/25/09 16:34:37   Page 2 of 17

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Crestar Bank v. Neal (In re Kitchen Equip. Co. of Virginia),*
  960 F.2d 1242 (4th Cir. 1992) .................................................................................................. 11

*Goddard v. Metropolitan Trust Co. of California,*
  82 F.2d 902 (9th Cir. 1936) ....................................................................................................... 7

*Greenzweight v. Title Guarantee & Trust Co.,*
  1 Cal. 2d 577 (1934) ............................................................................................................. 8, 9

*In re Hampton,*
  2001 WL 1860362 (Bankr. M.D. Ga. 2001) ........................................................................... 12

*Koehring Company v. Nolden (In re Pacific Trencher & Equip., Inc.),*
  735 F.2d 362 (9th Cir. 1984) ................................................................................. 2, 11, 12, 13

*Montgomery v. Bank of American Nat'l Trust & Savings Ass'n,*
  85 Cal. App. 2d 559 (Cal Ct. App. 1948) ............................................................................ 9, 10

*Morrow Crane Co. v. Affiliated FM Ins. Co.,*
  885 F.2d 612 (9th Cir. 1989) ..................................................................................................... 7

*Peoples Bank of Kentucky, Inc. v. US Bank (In re SJ Cox Enters., Inc.),*
  2009 WL 939573 *4 (Bankr. E.D. Ky. 2009) .......................................................................... 11

*Silvernail Mirror & Glass, Inc.,*
  142 B.R. 987, 989 (Bankr. M.D. Fla. 1992) ............................................................................ 12

*Smith v. Deutsch,*
  89 Cal. App. 2d 419, 425 (Cal. Ct. App. 1949) ......................................................................... 8

*Todd v. Bestermark,*
  145 Cal. App. 3d 374 (1956) ..................................................................................................... 9

*Watts v. Mohr,*
  86 Cal. App. 2d 256 (1948) ..................................................................................................... 10

**Other Authorities**

Bankruptcy Rule 7001(2) ........................................................................................................ 2, 14

CAL. CIV. CODE § 2295 ................................................................................................................. 5

CAL. CIV. CODE § 2330 ................................................................................................................. 6

CAL. COMM. CODE § 9402(8) ................................................................................................ 11, 12

CAL. COMM. CODE § 9506 ..................................................................................................... 11, 12

CAL. COMM. CODE § 9625 ............................................................................................................. 6

ii

00238-002\DOCS_SF:65985.6

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727   Doc# 180   Filed: 06/25/09   Entered: 06/25/09 16:34:37   Page 3 of 17

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtor and debtor in possession herein (the "Debtor") hereby submits its opposition (the "Opposition") to the *Motion of City National Bank for Order Requiring Debtor to Remit Sale Proceeds of Collateral* (the "Motion"), filed on June 12, 2009 [Docket No. 267]. By the Motion, City National Bank ("CNB") seeks immediate distribution of 87.5% of the proceeds from the sale of the Debtor's interests in AFE-Pioneer Associates, LP, if and when received. (The Committee is informed that such sale has not yet closed and it is unclear when such sale will close.) In support of this Opposition, the Committee represents as follows:

## I.

## INTRODUCTION

CNB is not entitled to immediate distribution of any sale proceeds in this case and the Motion should be denied because, by all appearances, CNB's asserted liens against the Debtor's assets were terminated prepetition. CNB's position to the contrary can be reduced to a single faulty premise: that CNB's delivery of instructions to First American Title Insurance Company ("First American"), as escrow agent, was not "authorization" to file amendments terminating CNB's underlying financing statement against the Debtor. Of course, CNB did not specifically "authorize" the filing of any terminating amendments, but somewhere along the line a mistake was made in the execution of these filings (either by CNB or its *de facto* agent, First American) and that mistake is now binding on CNB.

CNB admits that First American was its agent for the purpose of filing Form UCC-3 amendments releasing certain collateral, and nothing more. CNB's narrow construction of "authority," however, is belied by the actual instructions delivered to First American which "authorize[d] the filing of appropriate amendments" to CNB's original financing statement. Even assuming that CNB delivered the appropriate UCC-3 amendments to First American (a fact that is not entirely clarified by CNB's submissions in support of the Motion), First American was authorized to make the "appropriate" filings to amend CNB's underlying financing statement. Acting within the scope of that authority, First American apparently filed the two UCC-3 amendments that CNB intended to file, but there was one problem: the termination boxes were

1

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

06238-002\DOCS_SF:65985.6

Case: 09-41727 Doc# 180 Filed: 06/25/09 Entered: 06/25/09 16:34:37 Page 4 of 17

checked. The California Secretary of State (the "Secretary") then recorded CNB's underlying original financing statement as having been terminated. If First American made the mistake of checking the termination boxes, then it may be liable to CNB for damages, but that does not mean that the filings at issue were not "authorized." To the contrary, First American was expressly authorized to file the "appropriate amendments" and it did so by filing the UCC-3 amendments that CNB intended, but such filings contained a critical error that is now binding on CNB.

It is black letter law that an agent's actions (while acting within the scope of its authority) bind the principal. There is no exception for an agent's mistakes. In fact, any such an exception would quickly swallow the rule because the principal would always take the position after the fact (once something goes wrong) that the agent's action was a mistake and, therefore, not "authorized." That is not the law. The principal's remedy is to pursue the agent for the mistake. If First American made the mistake at issue here, CNB may have a claim against First American, but CNB's asserted liens against the assets of this estate have been terminated.

CNB's alternative argument that the filings at issue were not "seriously misleading" are similarly unavailing. There is Ninth Circuit precedent directly on point, and which continues to be binding precedent, that checking the termination box in a financing statement amendment by mistake, as happened here, is "seriously misleading" and therefore terminates the lender's security interest. *See Koehring Company v. Nolden (In re Pacific Trencher & Equip., Inc.)*, 735 F.2d 362 (9th Cir. 1984).

Finally, it bears mention that the Committee does not yet know who filed the termination statements at issue or all the circumstances surrounding such filings. The Committee also has not had an opportunity to conduct discovery on these points. Hence, to the extent that the Court is not inclined to deny the Motion based on the legal arguments made herein and the facts as currently presented, the Committee urges the Court to deny the Motion without prejudice pending the filing of an adversary proceeding by the Committee to determine the validity, priority or extent of CNB's liens under Bankruptcy Rule 7001(2).

///

///

2

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

06238-002\DOCS_SF:65985.6

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 5 of 17

## II.

## KNOWN AND UNDISPUTED FACTS

On May 5, 2009, the Committee filed the *Objection of Official Committee of Unsecured Creditors to Distribution of Sale Proceeds to City National Bank* [Docket No. 133] (the "Objection"). In the Objection, the Committee asserted that, based on the evidence available to date, CNB's lien was terminated and that therefore the proceeds of the Sale should not be remitted to CNB. The Objection and the Declaration of Maxim B. Litvak filed in support thereof (the "Litvak Declaration") are incorporated herein by this reference.

CNB has not challenged the factual assertions in the Objection or the Litvak Declaration, which are summarized below:

1. On August 9, 2004, CNB filed a UCC financing statement (the "Original Financing Statement") with the Secretary in order to perfect its security interest in "All Inventory, Accounts (Fees Receivable), General Intangibles, Equipment and Chattel Paper" owned by the Debtor. A copy of the Original Financing Statement is attached to the Litvak Declaration as Exhibit A.

2. In January 2009, the Debtor sold its general partnership interests in Westgate Housing Associates L.P. ("Westgate") and Greenery Housing Associates, L.P. ("Greenery"). On January 8, 2009, Rick Bell, an officer of the Debtor, sent an email to CNB attaching proposed releases of CNB's security interests in Westgate and Greenery and escrow instructions with respect to the contemplated sales of such assets. A copy of this email is attached to the Litvak Declaration as Exhibit B.

3. Subsequently, CNB delivered instructions to First American (these documents were also addressed to the Debtor) confirming that CNB would release its security interests in Westgate and Greenery upon payment of the purchase price from the pending sales of these assets. These instructions are attached to the Litvak Declaration as Exhibit C. As part of such instructions to First American, CNB expressly "***authorize[d] the filing of appropriate amendments***" to the Original Financing Statement (emphasis added). CNB has taken the position that UCC-3 amendments, in the form attached to the Litvak Declaration as Exhibit D**,** were also provided by CNB to First American.

3
OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 6 of 17

These forms do not have the termination boxes checked. Instead, they only have the deletion of collateral boxes checked.

4. On January 28, 2009, two UCC-3 amendments (the "Terminating Amendments") referencing the Original Financing Statement were filed with the Secretary. The Terminating Amendments were identical to the forms previously approved by CNB, but with one glaring difference. Both Terminating Amendments had the termination box checked, which was followed by standard language stating that: "TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement." A copy of both Terminating Amendments is attached to the Litvak Declaration as Exhibit E.

5. The Terminating Amendments were duly recorded by the Secretary as having terminated the Original Financing Statement. A copy of pertinent excerpts of the summary of UCC filings recorded by the Secretary against the Debtor is attached to the Litvak Declaration as Exhibit F.

6. On February 6, 2009, CNB filed two additional UCC-3 amendments (the "Correction Statements") stating that the Terminating Amendments were filed without CNB's authority and that CNB had only authorized the release of its security interest in the Debtor's interest in the Westgate and Greenery general partnership interests. Copies of the Correction Statements are attached to the Litvak Declaration as Exhibit G.

## III.

## UNKNOWN FACTS

The key fact that remains unknown is who checked the termination boxes on the Terminating Amendments.

The Motion and the *Declaration of Jerry McDermott* filed in support thereof (the "McDermott Declaration") do not unequivocally state that the UCC-3 amendments delivered by CNB to First American were free of any markings in the termination boxes.

Mr. McDermott testifies about delivering the executed instructions and UCC-3 amendments (without the termination boxes checked) to one of three shared administrative assistants who support

4

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727  Doc# 180  Filed: 06/25/09  Entered: 06/25/09 16:34:37  Page 7 of 17

06238-002\DOCS_SF:65985.6

the CNB Special Assets group. McDermott Declaration at ¶10. Mr. McDermott also testifies that he instructed the administrative assistant to deliver the materials to First American and the Debtor. McDermott Declaration at ¶11. However, Mr. McDermott does not recall specifically which administrative assistant handled these materials and neither do the administrative assistants themselves. McDermott Declaration at ¶11. It is not clear whether CNB has file copies of what was actually sent to First American and the Debtor.

The Committee has yet to obtain copies of the documents actually received by First American and the Debtor from CNB, or copies of the documents submitted by First American to the Secretary for filing. The Committee is prepared to conduct discovery on these points, if that becomes necessary.

## IV.

## ARGUMENT

**A. The Filing of the Terminating Amendments was Within
the Scope of First American's Authority and is Binding on CNB**

It is undisputed that CNB authorized First American to file "appropriate amendments" to CNB's Original Financing Statement. First American was therefore CNB's agent for purposes of effectuating such UCC-3 filings and CNB admits as much in the Motion. *See* CAL. CIV. CODE § 2295 ("An agent is one who represents another, called the principal, in dealings with third persons.")

CNB apparently delivered forms of the "appropriate amendments" (*i.e.*, UCC-3 amendments) that it wanted First American to file (as agent) on behalf of CNB. First American apparently filed these same forms with the Secretary, but with one glaring error: the termination boxes were checked.

CNB would now have the Court adopt an unreasonably narrow construction of the scope of First American's authority. Specifically, CNB seeks to limit First American's authority not to filing "appropriate amendments," but just to the filing of those specific documents that were purportedly delivered by CNB to First American, without the possibility of mistake or alteration. CNB's instructions to First American, however, were not so limited. They expressly authorized the filing of

5
OPPOSITION OF OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO MOTION OF CITY
NATIONAL BANK FOR ORDER REQUIRING
DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727   Doc# 180   Filed: 06/25/09   Entered: 06/25/09 16:34:37   Page 8 of 17
06238-002\DOCS_SF:65985.6

"appropriate amendments," which is what First American did, except that a mistake was apparently made in checking the termination boxes in such amendments.

A principal is bound by the acts of his agent while acting within the scope of his authority. *See* CAL. CIV. CODE § 2330 ("An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal."). Notably, under the California Commercial Code, a termination statement is merely an amendment of a financing statement (*i.e.*, a UCC-3 amendment) -- it is not some additional or separate document. *See* CAL. COMM. CODE §9102(79).

Here, CNB expressly authorized the filing of "appropriate amendments" to its Original Financing Statement and First American was acting consistent with that authority when it actually filed such amendments. CNB is therefore bound by the filing of the Terminating Amendments (even if a mistake was made in checking the termination boxes therein).

## B. CNB is Bound by Any Mistakes that May Have Been Made by Its Agent, First American, Acting Within the Scope of Its Authority

CNB argues that it is not bound by any mistakes that may have been made by First American because, by definition, such mistakes were not "authorized." Of course, mistakes are never expressly authorized, but they do happen and California law contemplates that there may be liability to the extent they occur. (For instance, CNB may have claims arising under section 9625 of the California Commercial Code.) In effect, CNB is asking the Court to read the possibility of error completely out of California law. If CNB were to prevail, the fundamental premise that a principal is bound by the acts of its agent would be quickly swallowed up by arguments that an agent's mistakes were never authorized in the first place, a form of "no harm, no foul" rule that would fully exonerate the principal of its agent's misconduct in every instance.

The Ninth Circuit established long ago that an agent's mistake or disregard of the principal's instructions does not take the agent's actions outside the scope of the agent's authority and, therefore, binds the principal. (CNB attempts to distinguish these cases, but as set forth below, they are clearly relevant and directly applicable here.) In *Goddard v. Metropolitan Trust Co. of*

6
OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

66238-002\DOCS_SF:65985.6

Case: 09-41727 Doc# 180 Filed: 06/25/09 Entered: 06/25/09 16:34:37 Page 9 of 17

*California,* 82 F.2d 902 (9th Cir. 1936), a principal authorized an agent to make a loan to a third person and to acquire a security interest in collateral in exchange for the loan. The agent made the loan but failed to acquire the security interest. The principal then sued the agent for conversion for giving away the principal's money without authorization. The court held that while the agent clearly violated the principal's instructions, he was still acting within the scope of his agency, and, therefore, could not be found liable for conversion. *Id.* at 904.

Here, like the agent in *Goddard*, First American (to the extent that it is the responsible party for the Terminating Amendments at issue) may have misunderstood CNB's intentions, but it was still acting within the scope of CNB's authorization to file the "appropriate amendments" of the Original Financing Statement. As the Ninth Circuit stated in *Goddard*, "[t]he complaint shows, not a complete departure from the agent's authority, but a mere violation of the principal's instructions regarding the manner in which the authority should be exercised." *Goddard,* 82 F.2d at 904. That may be precisely what happened here. First American was supposed to file UCC-3 amendments to the Original Financing Statement releasing certain specified collateral in accordance with CNB's direction, but First American may have made the mistake of filing these same documents with the termination boxes checked. The Terminating Amendments, however, were identical in every respect to the amendments that CNB wanted First American to file, but with the termination boxes checked. Under *Goddard,* this mistake does not render the action unauthorized.

Other cases bolster the point. For example, in *Morrow Crane Co. v. Affiliated FM Ins. Co.,* 885 F.2d 612 (9th Cir. 1989), an agent violated his principal's instructions by contracting to have cranes shipped above deck, instead of below deck. The court held that although the agent had botched the job, the principal nonetheless remained bound by the agent's contract with the shipper because the agent entered into the contract while performing the assigned task of arranging shipment. *Id.* at 615. The same is true here. Even though First American may have checked the wrong box, CNB remains bound because First American was performing its assigned task of amending the Original Financing Statement.

7
OPPOSITION OF OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO MOTION OF CITY
NATIONAL BANK FOR ORDER REQUIRING
DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 10 of 17

Finally, in *Smith v. Deutsch,* 89 Cal. App. 2d 419, 425 (Cal. Ct. App. 1949), the court stated:

> It is not necessary that a specific act, or failure to act, be authorized as such by the principal to bring it within the scope of the agent's authority. *It is within the scope of his authority if it is done while the agent is engaged in the transaction of business which has been assigned to him for attention by his principal* . . . . (emphasis added).

Here, First American may have made a mistake while "engage[d] in the transaction of business which [had] been assigned" by CNB, which was to amend the Original Financing Statement, but CNB remains bound and the Terminating Amendments were effective.

## C. The Escrow Agent Cases Cited by CNB Substantiate the Point that an Agent's Mistakes Bind the Principal

CNB takes the position that escrow agents are somehow held to a higher standard than other agents in terms of determining the scope of their authority. However, the cases cited by CNB do not support this argument and instead reinforce the general rule that an agent's mistakes bind the principal. (CNB also ignores the fact that a strict construction of First American's authority would not help CNB here given that the escrow instructions at issue specifically authorized First American to file the "appropriate amendments" and did not limit First American's authority to any specific set of documents.)

As for the cases cited by CNB, in *Greenzweight v. Title Guarantee & Trust Co.*, 1 Cal. 2d 577 (1934), a case dating back to the Great Depression, the plaintiff agreed to release its lien in real property in exchange for having its loan paid off upon the sale of the property. When the escrow company received a check from the buyer, it recorded a deed that released the lender's security interest. However, before the check cleared and the escrow company could transfer the funds to the lender, the regulators closed the escrow company and presumably seized all of its money.

The secured lender sought declaratory relief that it continued to retain a valid security interest against the real property on the grounds that the escrow company had violated its instructions by accepting the check, instead of demanding cash. The court ruled that accepting a check did not violate the principal's instructions. In any event, the court added:

> [T]he escrow holder became the agent of the plaintiff as to such money and *any impropriety in its subsequent conduct with regard thereto must be borne by plaintiff* and not by the defendants. In other words, if

8
OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

DOCS_SF:65989.6
Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 11 of 17

> the escrow holder violated its duty in so "redepositing" the proceeds of the check with the Bank of America, or in permitting the credit therefore to stand until such time as conditions compelled its cessation of business, it did so *as the agent of the plaintiff who, as against innocent third parties, should now bear the loss*.

*Id.* at 582 (emphasis added). Thus, even if accepting the check violated the secured lender's instructions, the secured lender was bound by the agent's conduct and the lien release was valid (even though it was not authorized). This case supports the Committee's argument that when an agent makes a mistake or disobeys instructions, while acting with the scope of the duties assigned to it by the principal, the principal is bound by those mistakes.

Similarly, *Todd v. Bestermark,* 145 Cal. App. 3d 374 (1956), cited by CNB, reinforces the point that an agent's actions bind the principal. In *Todd*, the buyers deposited $6,000 with an escrow company with directions to transfer the money to the seller when the title insurance was obtained. Before the title insurance was obtained, the president of the escrow company embezzled the $6,000 and the escrow company recorded both the grant deed transferring title to the buyer and the reconveyance deed releasing the security interest. Therefore, the seller lost the property without consideration and the secured lender lost its security interest without any payment of the loan. The seller sued the buyer to quiet title and the secured lender sued the seller and the buyer for a declaration that the property was still subject to the lien.

The court held that the escrow company was the buyer's agent and the buyer was the principal. Therefore, although the buyer had not authorized the escrow company to embezzle the money, transfer the deed or release the security interest, the buyer was bound by the escrow agent's misconduct and would bear the loss of the agent's mistake. Similarly in the instant case, CNB may have claims against First American if it turns out that First American mistakenly checked the termination boxes on the Terminating Amendments, but in any event, CNB is bound by the filing of the Terminating Amendments.

CNB also cites *Montgomery v. Bank of American Nat'l Trust & Savings Ass'n*, 85 Cal. App. 2d 559 (Cal. Ct. App. 1948), to support its argument that the Terminating Amendments in this case were "null and void." In *Montgomery*, an escrow company changed the property description on a grant deed. The seller of the property -- who only meant to sell a portion of a lot -- sued the escrow

9

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 12 of 17

company after realizing that in fact the entire lot had been conveyed to the buyers. The court held that the escrow company was not liable for damages because the deed, conveyed without authority, was null and void and the court directed the seller to sue the buyer to quiet title.

The court in *Montgomery*, however, made it clear that: "*If the subject of this action were personal property* defendant would be answerable in damages." *Id.* at 564 (emphasis added). Thus, *Montgomery's* holding -- that deeds conveyed by mistake are null and void -- is limited to real property collateral. When the matter involves personal property (as is the case here), the escrow agent's mistaken actions are not void and the principal has a cause of action in damages against such agent.

CNB also misconstrues the decision in *Watts v. Mohr*, 86 Cal. App. 2d 256 (1948). This decision does not stand for the proposition that the principal is not bound when an escrow agent does not comply with its instructions "to the letter." In *Watts*, a buyer of real property sued the seller for specific performance after the seller cancelled the escrow agreement pursuant to its terms. The buyer argued that enough of the terms of the escrow agreement had been fulfilled to justify specific performance. In this context, the court responded that "[c]ompliance [with an escrow agreement] must be full and to the letter." *Id.* at 262. Because the buyer had not met each and every term of the escrow agreement "to the letter," the seller's obligation to sell had not been triggered and specific performance could not be ordered. *Watts* does not suggest that an escrow agent's mistakes are not binding.

Finally, CNB relies on an article written by First American for the proposition that mistaken termination filings have no consequence. This article is obviously self-serving and is simply inconsistent with applicable law, as cited herein.

**D.     The Terminating Amendments (Even if They Contained Mistakes) were Effective in Terminating CNB's Security Interests Against the Assets of this Estate**

Whether the termination boxes in the Terminating Amendments were mistakenly checked by First American or CNB, the filing of the Terminating Amendments was effective and binding on CNB in terminating CNB's liens against the assets of this estate as a matter of Ninth Circuit law.

10

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 13 of 17

The decision in *Koehring Company v. Nolden (In re Pacific Trencher & Equip., Inc.)*, 735 F.2d 362 (9th Cir. 1984), is directly on point. In *Pacific Trencher*, the Ninth Circuit held that mistakenly checking the termination box in an amendment to a financing statement terminated the secured lender's security interest. The case involved a secured lender that agreed to partially release its security interest in certain of the debtor's assets. It inadvertently checked the termination box and listed the released collateral. Later discovering its mistake, the lender filed a new financing statement. When the debtor filed bankruptcy, the secured lender filed an adversary proceeding seeking to reform its financing statement to provide that it had not been terminated. The Ninth Circuit ruled that reformation did not apply.

The Ninth Circuit also rejected the secured lender's argument that checking the termination box was not "seriously misleading." In making this argument, the secured lender relied on section 9402(8) of the old California Commercial Code (section 9506 of the new California Commercial Code) which provided that "[a] financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

In support of its argument that mistakenly checking the termination box was not "seriously misleading," the secured lender pointed out that no one had been harmed. The Ninth Circuit rejected these arguments and held that mistakenly checking the termination box, but also listing released collateral, was "seriously misleading" and that the statement could not be treated as an effective financing statement, but instead had to be treated as terminating the lenders' security interest.

The Ninth Circuit added:

> It is not determinative that no actual creditor was misled. It matters that a potential creditor could have been misled. Consequently, it is the conclusion of this court that the error resulting in the termination of the financing statement was seriously misleading viewed from the standpoint of a potential creditor reviewing the records.

*Id.*, 735 F.2d at 364 (quotations and citations omitted). Other courts agree with the Ninth Circuit's approach in *Pacific Trencher*. *See Crestar Bank v. Neal (In re Kitchen Equip. Co. of Virginia)*, 960 F.2d 1242 (4th Cir. 1992) (lender checked termination box, but then listed collateral to be released; held: financing statement was terminated); *Peoples Bank of Kentucky, Inc. v. US Bank (In re SJ Cox Enters., Inc.)*, 2009 WL 939573 *4 (Bankr. E.D. Ky. 2009) ("[t]he filing of a termination statement

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

00238-002\DOCS_SF:65989.6

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 14 of 17

cannot be considered a minor error."); *In re Hampton*, 2001 WL 1860362 (Bankr. M.D. Ga. 2001) (creditor was unsecured where it mistakenly terminated financing statement); *In re Silvernail Mirror & Glass, Inc.,* 142 B.R. 987, 989 (Bankr. M.D. Fla. 1992) (court could not apply equitable principles to reinstate creditor's lien against debtor's assets where creditor mistakenly filed a termination statement terminating its financing statement).

Perhaps recognizing the significance of *Pacific Trencher*, CNB suggests that the decision has been abrogated by subsequent revisions to the California Commercial Code. In fact, section 9402(8) of the old California Commercial Code, discussed in *Pacific Trencher*, has been carried over into section 9506 of the new California Commercial Code almost verbatim. Therefore, the statutory basis for *Pacific Trencher* has remained intact and the decision remains good law.

CNB also tries to distinguish *Pacific Trencher* on the basis that both the termination and deletion boxes were checked in the Terminating Amendments filed in this case, while only the termination box was checked in *Pacific Trencher*. CNB argues that because the "release" (in fact, it was a "deletion") box was checked on the Terminating Amendments and collateral was listed, parties would realize that the Terminating Amendments were only partially releasing CNB's security interest in the Debtor's assets and the mistake of checking the termination box was not "seriously misleading." In contrast, in *Pacific Trencher*, only the termination box was checked and the "release" box was *not* checked (but specific released collateral was nonetheless listed). Therefore, CNB argues that the termination statements in *Pacific Trencher* were more misleading than the Terminating Amendments in this case.

CNB's position does not make sense. The facts in this case and *Pacific Trencher* are nearly identical. And to the extent they differ, the Terminating Amendments in this case are *even more* misleading than those filed in *Pacific Trencher*.

First, the striking similarities. In both *Pacific Trencher* and this case, the termination box is checked and the statements provide that the secured lender's financing statement is "terminated." *Compare* the Terminating Amendments, Litvak Declaration at Exhibit E ("TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement."), with *Pacific Trencher*,

12

SF 00238-002\DOCS_SF:65985.6

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 15 of 17

735 F.2d at 364 ("TERMINATION – The Secured Party certifies that the Secured Party no longer claims a security interest under the Financing Statement bearing the file number shown above.").

In both *Pacific Trencher* and this case, the Secretary of State listed the security interest as terminated. *Compare* Secretary of State Summary, Litvak Declaration at Exhibit F, with *Pacific Trencher*, 735 F.2d at 363.

Finally, in both cases, the secured lender attempted to fix the problem by filing a corrective statement. Compare Correction Statements, Litvak Declaration at Exhibit G; with *Pacific Trencher*, 735 F.2d at 363, n. 1.

Despite these close similarities, the Terminating Amendments in this case are even more misleading than in *Pacific Trencher* because in addition to expressly stating that CNB's financing statement was terminated, the box for "deleted collateral" was also checked and in the list of "deleted collateral," there is no indication that CNB is retaining an interest in any collateral.

In its final attempt to get out from under the holding in *Pacific Trencher*, CNB argues that the world was put on inquiry notice of the "possible existence" of a lien by CNB and therefore checking the termination box was not seriously misleading. However, the same inquiry notice would have existed in *Pacific Trencher* because (like CNB) the secured lender in that case filed a corrective statement after discovering its mistake. Moreover, the test is not whether someone was put on inquiry notice of the potential existence of a lien, but rather whether "a potential creditor could have been misled." *Pacific Trencher,* 735 F.2d at 364. The Ninth Circuit has held that when the termination box is checked, potential creditors could be mislead, the mistake is "seriously misleading," and the security interest is terminated. Hence, CNB's security interest was terminated by virtue of the filing of the Terminating Amendments (even if a mistake was made).

E. **The Committee Should Have an Opportunity to Conduct Discovery and Litigate the Validity, Priority or Extent of CNB's Asserted Liens Through an Adversary Proceeding**

Key facts surrounding the filing of the Terminating Amendments remain unknown. For instance, the Committee does not yet know who checked the termination boxes at issue, what documents were delivered to First American by CNB, what documents First American delivered to the Secretary, and what may have transpired between First American's receipt of the documents for

13
OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL

Case: 09-41727    Doc# 180    Filed: 06/25/09    Entered: 06/25/09 16:34:37    Page 16 of 17

filing and the date that the Terminating Amendments were filed. The Committee also has not had an opportunity to conduct discovery. Hence, to the extent that the Court is not inclined to deny the Motion outright, the Committee urges the Court to deny the Motion without prejudice pending the filing of an adversary proceeding by the Committee to determine the validity, priority or extent of CNB's liens under Bankruptcy Rule 7001(2).

## V.
## CONCLUSION

Based on the foregoing, the Court should deny the Motion because the facts known to date indicate that First American, acting within the scope of its authority, filed the Terminating Amendments and such filing was effective in terminating CNB's security interests against the assets of this estate. CNB is therefore nothing more than an unsecured creditor and is not entitled to an immediate distribution of any sale proceeds.

Dated: June 25, 2009    PACHULSKI STANG ZIEHL & JONES LLP

By  */s/ Pamela E. Singer*
    Pamela E. Singer
    Attorneys for the Official Committee of
    Unsecured Creditors

14
Case: 09-41727  Doc# 180  Filed: 06/25/09  Entered: 06/25/09 16:34:37  Page 17 of 17

OPPOSITION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF CITY NATIONAL BANK FOR ORDER REQUIRING DEBTOR TO REMIT SALE PROCEEDS OF COLLATERAL