```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                            OAKLAND DIVISION

 3   In Re:                        )   Case No. 09-41727 J
                                   )   Chapter 11
 4   A.F. EVANS COMPANY, INC.,     )
                                   )
 5          Debtor.                )   Oakland, California
                                   )   Thursday, July 2, 2009
 6                                 )   2:30 p.m. Calendar
                                   )
 7                                 )   1.  MOTION OF CITY NATIONAL
                                   )   BANK FOR ORDER REQUIRING
 8                                 )   DEBTOR TO REMIT SALE PROCEEDS
                                   )   OF COLLATERAL
 9                                 )
                                   )   2.  STATUS CONFERENCE ON
10                                 )   MOTION TO SELL AND ASSIGN
                                   )   PARTNERSHIP INTEREST
11   _____)

12                      TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE EDWARD D. JELLEN,
13                   UNITED STATES BANKRUPTCY JUDGE.

14   APPEARANCES:

15   For the Official Committee   Pamela E. Singer
     of Unsecured Creditors:      PACHULSKI STANG ZIEHL & JONES
16                                150 California Street, 15th Floor
                                  San Francisco, CA 94111-4500
17                                (415) 263-7000

18   For City National Bank:      Frank Pepler
                                  T. Scott Bucey
19                                PEPLER MASTROMONACO, LLP
                                  100 First Street, 25th Floor
20                                San Francisco, CA  94105
                                  (415) 978-9860
21
     For the Alliant Parties:     Margaret M. Mann
22                                SHEPPARD MULLIN RICHTER &
                                    HAMPTON, LLP
23                                501 W. Broadway, 19th Floor
                                  San Diego, CA  92101-3598
24                                (619) 338-6500

25
```

```
 1   APPEARANCES, cont'd.:

 2   For the U.S. Trustee:        Barbara A. Matthews
                                  ASSISTANT UNITED STATES TRUSTEE
 3                                1301 Clay Street, Suite 690N
                                  Oakland, CA  94104
 4                                (510) 637-3206

 5   For the Debtor:             Chris D. Kuhner
                                  Eric A. Nyberg
 6                                KORNFIELD NYBERG BENDES &
                                    KUHNER, PC
 7                                Lake Merritt Plaza
                                  1999 Harrison Street, Suite 2675
 8                                Oakland, CA  94612
                                  (510) 763-1000
 9
     For the Official Committee  Maxim B. Litvak
10   of Unsecured Creditors:     PACHULSKI STANG ZIEHL & JONES
     (Via Telephone)             150 California Street, 15th Floor
11                                San Francisco, CA 94111-4500
                                  (415) 217-5110
12
     For CP III Evans, LLC:      Alan M. Feld
13   (Via Telephone)             Robert Sherman
                                  MANATT PHELPS & PHILLIPS
14                                11355 W. Olympic Boulevard
                                  Los Angeles, CA  90064
15                                (310) 312-4153

16   Electronic Court            Amber Counts
     Recorder:                   United States Bankruptcy Court
17                                P.O. Box 2070
                                  Oakland, CA  94604-2070
18                                (510) 879-3568

19   Transcription Service:      Kathy Rehling
                                  209 Bay Circle
20                                Coppell, TX  75019
                                  (972) 304-1998

21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

1          <u>OAKLAND, CALIFORNIA - JULY 2, 2009 - 2:44 P.M.</u>

2          THE COURT:  Matter of A.F. Evans Company.

3          MS. SINGER:  Good afternoon, Your Honor.  Pamela

4    Singer of Pachulski Stang Ziehl & Jones on behalf of the

5    Official Committee of Unsecured Creditors.

6          THE COURT:  Okay.

7          MR. PEPLER:  Good afternoon, Your Honor.  Frank

8    Pepler appearing on behalf of City National Bank.  And Scott

9    Bucey of my office is also in court.

10         THE COURT:  Okay.  Thank you.

11         MS. MANN:  Good afternoon, Your Honor.  Margaret

12   Mann of Sheppard Mullin Richter & Hampton appearing on behalf

13   of the Alliant parties.

14         THE COURT:  Okay.  Thank you.

15         MS. MATTHEWS:  Good afternoon, Your Honor.  Barbara

16   Matthews appearing on behalf of the United States Trustee.

17         MR. KUHNER:  Good afternoon, Your Honor.  Chris

18   Kuhner and Eric Nyberg on behalf of the Debtor.

19         THE COURT:  All right.  Let's see.  I have two

20   things on the calendar.  One is a status conference on the

21   motion to sell, where the presumed intention, at least at

22   this end, is to set an evidentiary hearing.  And I would

23   appreciate guidance from the parties as to how much time I

24   need to set aside and when that hearing should be.  And then

25   we have a motion by City National concerning the sale

1 proceeds.

2        MS. SINGER: Your Honor, excuse me for interrupting.

3 Pam Singer. I wanted to point out that Max Litvak has also

4 appeared on behalf of the Committee and is on the phone.

5        THE COURT: Oh, thank you, Ms. Singer. Is Mr.

6 Litvak available by phone, Ms. --

7        MR. LITVAK: I am on the line, Your Honor. I hope

8 you can hear me.

9        THE COURT: I can hear you, Mr. Litvak. I didn't

10 mean to overlook you. So your appearance is noted. Thank

11 you for correcting me, Ms. Singer.

12        MS. SINGER: You're welcome, Your Honor.

13        THE COURT: All right.

14        MR. FELD: Your Honor, it's also Alan Feld and Rob

15 Sherman of Manatt Phelps on the phone for secured creditor CP

16 III.

17        THE COURT: Oh, okay. Mr. Feld and Mr. Sherman.

18 Thank you both.

19        MR. FELD: Okay. Thank you.

20        MR. KUHNER: Thank you, Your Honor. Chris Kuhner.

21    In addition to those two matters, Your Honor, at the end

22 of the hearings today we'd like to discuss a proposed

23 stipulation for continued use of cash collateral. We've

24 entered into sort of a stopgap --

25        THE COURT: All right.

1        MR. KUHNER: -- to -- or, a 17-day stipulation to

2 use cash collateral. We'll bring that up at the end, Your

3 Honor.

4        THE COURT: All right.

5        MR. KUHNER: As to the status conference, Ms. Mann

6 and myself have been discussing a potential -- a schedule. I

7 think we've agreed to a timeline, and assuming it works with

8 Your Honor, we would like to have a hearing date -- I'll work

9 backwards -- sometime in the middle of August.

10       THE COURT: How much time for the hearing?

11       MR. KUHNER: I think about a half a day. We

12 anticipate three witnesses, maybe four, from the Debtor at

13 the most. Not very long. And we would do direct testimony

14 through declarations.

15       MS. MANN: Your Honor, I anticipate an equal number

16 of witnesses. My experience is --

17       THE COURT: Eight witnesses in a half a day --

18       MS. MANN: I was just going to say that.

19   (Laughter.)

20       MS. MANN: Despite discussions with counsel about

21 making this as expedited as possible, I think two days would

22 be safer as well as more convenient. And obviously we don't

23 need to use the second day if we don't need to use it.

24       THE COURT: Yes. The issues here basically have to

25 do with the authority and discretion, if any, of the proposed

1  new partner.  I just can't see how it could take two days.

2          MS. MANN:  Your Honor, --

3          MR. KUHNER:  I think one day would be fine.

4          MS. MANN:  Your Honor, my concern is there are two

5  issues here.  You know, there's the identity of the partner,

6  as Your Honor identified in the memorandum.  But we also have

7  the evidence of cure and whether that's sufficient.  And so

8  it's because of both issues that I think we should reserve

9  the two days.

10          THE COURT:  What are the factual issues on the cure?

11  What kind of evidence am I going to be hearing about?

12          MS. MANN:  Your Honor, we have not seen a revised --

13  I understand that there's -- the Debtor's intention is to

14  enter into a revised sale agreement with Reliant that may

15  address some of the issues that we have regarding whether

16  this is a breaking-away of the benefits of the partnership

17  away from the obligation.  So there's also a number of issues

18  with regard to the management agreement and those

19  responsibilities and whether the proposal is consistent with

20  the partnership agreement.

21      So it really is about the -- not only the natures of the

22  duties left under this agreement, but how exactly this deal

23  intends to satisfy those responsibilities so as to comport

24  with the provisions of the Code.

25          THE COURT:  And this is in August?

1    MR. KUHNER:  Yes, Your Honor.

2    THE COURT:  Madam Deputy, what do we have in August?

3  I can't believe this would take two days for the Debtor to

4  put on adequate assurance of cure, if the evidence exists.

5  Or of future performance, I should say.  And --

6    MR. KUHNER:  We don't think it will take more than a

7  day, Your Honor.

8    THE COURT:  Well, let's set a day.  I think the

9  parties can do this in a day.  I don't want to -- and then as

10  far as the duties of the proposed assignee and whether this

11  comes within the category of discretionary/important or just

12  basically an entity whose skills and intentions aren't very

13  relevant, well, that shouldn't take two days.  Madam Deputy,

14  let's find a day.

15    THE CLERK:  Yes, Your Honor.  August 11 at 10:00

16  a.m.

17    MS. MANN:  Your Honor, just a little more clarity

18  here.  This is a tax credit partnership with some very

19  complex regulations that apply, both on a local level and on

20  the federal level.  And it may be that there are -- we need

21  an expert witness to help explain them.  I haven't -- without

22  knowing what the adequate assurance is yet, --

23    THE COURT:  Let's not blow this up into a

24  thermonuclear war.  You know, I mean, if I said let's set

25  aside two months, some attorneys would say, "Give me three

1   months."  I mean, we can do this in a day.  I'm sure, with

2   intelligent, smart lawyering that prudently use their time

3   and their witnesses to get to the nugget of the issue, that a

4   day should work.

5       So Madam Deputy, can we find a day?

6           THE CLERK:  Yes, Your Honor.  August 11 at 10:00

7   a.m.

8           MR. KUHNER:  That's fine with me, Your Honor.

9           THE COURT:  All right.

10          MS. MANN:  That's fine, Your Honor.

11          THE COURT:  Why don't we start at 9:30?  That'll

12  give you a little extra.  You get an extra half hour already.

13  All right.  So, 9:30 on August 11.

14          MR. KUHNER:  And what --

15          THE COURT:  And then --

16          MR. KUHNER:  I'm sorry.

17          THE COURT:  -- I would like the parties to file and

18  serve trial briefs seven days before that.

19          MS. MANN:  Okay.

20          THE COURT:  File and serve witness lists seven days

21  before that.  You don't need to go into detail about what the

22  witness is going to say, but if the identity of the witness

23  is not someone known to the other side, just a brief

24  description:  "The witness is the proposed general partner"

25  or "The witness is someone who drafted some document who was

1  instructed to say such-and-such."  Just, you know, a one-line

2  or two-liner to identify the person.

3      And then, finally, any documents to come into evidence

4  are to be exchanged -- you don't need to file them --

5  exchanged seven days before the trial.  I will issue a

6  scheduling order concerning the pre-marking of documents and

7  that sort of thing.

8              MS. MANN:  Your Honor, we actually had talked about

9  moving those dates back a little in case there is a need for

10 discovery on either side.  Is that possible?

11             THE COURT:  Sure.  Anything's possible when you're

12 talking about a day.

13             MR. KUHNER:  I think we're -- this is what gets

14 filed with the Court.  We discussed, just between the two of

15 us, to exchange documents --

16             MS. MANN:  And actually, on July 13.

17             MR. KUHNER:  Discovery.

18             THE COURT:  All right.

19             MR. KUHNER:  So I don't think that needs to change

20 the Court's schedule in terms of when we file.

21             THE COURT:  Is that okay?  Leave it July -- August

22 11th?

23             MS. MANN:  Yeah.  We can work with the Court's

24 schedule.  I just wanted --

25             THE COURT:  Okay.

1   MS. MANN:  I was a little confused about whether our

2   --

3   THE COURT:  All right.

4   MS. MANN:  -- previous schedule had been overruled.

5   But Mr. Kuhner --

6   THE COURT:  No, no.  Your previous is not overruled.

7   MR. KUHNER:  Right.

8   THE COURT:  So, in fact, why don't I ask, Mr.

9   Kuhner, could you get a copy of my form scheduling order and

10  modify it as you will, in cooperation with opposing counsel?

11  In other words, the two parties can play with it and put in

12  whatever dates you want, except for August 11th at 9:30, one

13  day.  That stays.  You can do whatever else you want with it.

14  Okay?

15  MR. KUHNER:  And just --

16  MS. MANN:  Right.

17  MR. KUHNER:  Just for the record, for Ms. Mann's

18  comfort, we are -- we have agreed to -- the parties will

19  exchange names of witnesses as well as documents that we

20  believe are relevant by July 13, 2009.

21  THE COURT:  All right.  Yes.  Ignore any deadlines

22  or dates I gave you other than the date of the trial and the

23  time.  Fill in whatever you like.  July 13 happens to be my

24  birthday, so maybe you'll have a good time exchanging

25  documents by that date.

1      (Laughter.)

2            MS. MANN:  Thank you, Your Honor.

3            MR. KUHNER:  Thank you, Your Honor.

4            THE COURT:  All right.  Thank you both.

5      Anything else on the evidentiary hearing?

6      (No response.)

7            THE COURT:  All right.  That brings us, then, to the

8  motion to remit the sale proceeds.  I guess my first question

9  is, are there sales proceeds to remit?

10            MR. PEPLER:  Your Honor, Frank Pepler appearing on

11  behalf of City National.  There are not sale proceeds, but

12  I've gotten a request for a partial release in connection

13  with the Plaza sale.  It's scheduled to close on Tuesday.

14            THE COURT:  The sale will close on Tuesday?

15            MR. PEPLER:  And there will be $1.44 million of

16  gross sale proceeds, of which, under the cash collateral

17  agreement, we get --

18            THE COURT:  All right.

19            MR. PEPLER:  -- 87-1/2 percent.

20            THE COURT:  So if I didn't want to issue an advisory

21  committee, I should wait till after Tuesday and let someone

22  advise me that there's some sales proceeds for me to opine

23  about?  Is that --

24            MR. PEPLER:  Well, since the Committee is

25  threatening to also bring an adversary proceeding against us

1   on the same theories it's advancing in its opposition to the

2   sale motion, --

3          THE COURT:  But adversary proceeding motion.  I

4   can't render an opinion about disposing of proceeds that are

5   nonexistent.  I mean, so once the sale closes, then, you

6   know, we can deal with who gets them.  But I guess I

7   shouldn't be issuing any rulings until I know that there are

8   some sale proceeds to talk about.

9          MS. SINGER:  Your Honor, Pam Singer.  That's the

10  Committee's initial point.

11         THE COURT:  Yes.  I mean, I'll hear what people have

12  to say, and if someone just sends me a fax saying, "The sale

13  closed and now you can issue a ruling," that's fine with me.

14     All right.  Mr. Pepler, I have read your papers.  I've

15  also read the opposition.  Anything you want to clarify or

16  respond to?  Otherwise, I think I have a handle on it.

17         MR. PEPLER:  No, I'm sure that you do, Your Honor.

18  The only thing that I would note is that the Committee's

19  brief omits any discussion of the relevant provision of the

20  UCC which governs post-revised Article IX terminations,

21  amendments and financing statements.

22         THE COURT:  9510(a) is the section in the --

23         MR. PEPLER:  That is the one.  It's one of our

24  favorites.  I'm sure you're aware of it.

25     Other than that, I feel confident that --

1    THE COURT:  I'll give you a chance to respond to

2  anything Ms. Singer has to say, if she's going to argue it.

3    Ms. Singer, my question for you, and you can -- again,

4  I've read your papers.  If I understand the facts correctly

5  here, prior to the filing of the petition -- the petition I

6  have was filed on March 5, '09.  And a corrective UCC-3 was

7  filed on February 6, '09.  So, as of the date of the

8  petition, even assuming, arguendo, that the termination

9  statement went into effect, it seemed like at the date of the

10  petition everything was corrected.  So what is your basis for

11  complaint, even assuming, just for sake of discussion, that

12  prior to the corrective statement being filed there was a

13  problem from the bank's standpoint?

14    MS. SINGER:  The basis for our objection is the

15  Ninth Circuit's decision in *Pacific Trencher*, where, under

16  nearly identical -- under identical facts, and a corrective

17  statement in *Pacific Trencher* was also filed, the court found

18  that once the termination box is terminated, the security

19  interest is terminated.  And the corrective statement, it

20  doesn't -- isn't sufficient to -- it doesn't change that

21  fact.  And in *Pacific Trencher*, the issue was reserved as to

22  whether or not that corrective statement was really the

23  creation of a security interest within 90 days.

24    THE COURT:  The perfection of a security interest,

25  you mean?

1          MS. SINGER:  Yeah, the perfection of the security

2     interest within the 90 days.  So the basis for our decision,

3     Your Honor, is *Pacific Trencher*.

4          THE COURT:  But was Section 9510(a) in effect at

5     that time?  At the time of *Pacific Trencher*, I mean?

6          MS. SINGER:  Oh, nine five -- let me pull it up.

7          THE COURT:  That's the section that says a filing is

8     ineffective to the extent that it's not authorized.  I'm

9     overparaphrasing.

10          MS. SINGER:  No, that was not in effect when --

11          THE COURT:  Yes.

12          MS. SINGER:  -- *Pacific Trencher* was passed.  But

13     what -- and as we have in the briefs, what the official

14     comment makes clear is that -- the entire issue of who has

15     authority to file a financial statement, and in order for a

16     financial statement to be effective it has to be filed with

17     authority.  Authority is decided by law outside of the UCC.

18          THE COURT:  But here we have documents that tell us

19     what the authority was.  The authority was to file a UCC-3

20     that didn't terminate but just merely scaled back the scope

21     of perfection.  That's the evidence I have in front of me as

22     to what the authority was.

23          MS. SINGER:  Well, what --

24          THE COURT:  And my other -- let me --

25          MS. SINGER:  Uh-huh.

 1        THE COURT:  The other thing here, if you look at the

 2   statement that was actually filed, yes, the termination box

 3   was filed, but the textual part referred not to a

 4   termination, saying, "This security interest is gone.  Bye-

 5   bye, baby.  No more security interest."  It said that it was

 6   being pared back.  So anybody looking at that would know that

 7   the intent wasn't to throw it out completely but to limit it,

 8   right on the face of it.

 9        MS. SINGER:  Well, Your Honor, there's a safe harbor

10   in the UCC for mistakes, and I think that's what the Court is

11   alluding to, is that some mistakes just seem minor and --

12        THE COURT:  And also alluding to *Pacific Trencher*,

13   which didn't have that fact.

14        MS. SINGER:  Well, it did have that fact.  In

15   *Pacific Trencher*, Your Honor, there was a listing of the

16   collateral exactly like in our case.  And the court found

17   that the safe harbor of minor errors doesn't apply.

18        And let me just back up a little bit.  We don't know what

19   the facts are, Your Honor.  And the issue cannot be decided

20   in a contested matter on a motion.  There does have to be an

21   adversary proceeding.  But the Committee has chosen not to

22   bring that adversary proceeding until there are proceeds to

23   fight about.  And we have heard that there's going to be

24   closing after closing, and we prudently have decided to wait

25   until there is something to really fight about.

1    So -- and the issue -- under Revised Article IX,

2  authority is decided by agency law.  Now, we don't know

3  whether First American filed this or -- we really don't know

4  whether even City National Bank -- who checked that box.  It

5  could be that one of the administrative assistants at CNB

6  checked that box.  And Your Honor, if this were entirely in-

7  house, if this had gone from the business person to the legal

8  department to the paralegal to the filing clerk, and

9  somewhere along that chain the termination box had been

10 mistakenly checked, we wouldn't be here, because *Pacific*

11 *Trencher* has not been abrogated by the UCC and it's a

12 seriously misleading mistake.

13    There is a possibility of an agency issue here in that

14 First American was told -- and City National Bank does say

15 that First American was its agent for filing appropriate

16 amendments.  And somewhere along the line, the termination

17 box got checked.  Was checking that termination box within

18 the scope of that agency to file an appropriate amendment?

19 Under the UCC, a termination statement is defined as many

20 things.  It's a UCC-3 statement, and it includes an

21 amendment.  So accidentally -- it's 10278.  So accidentally

22 checking the termination box doesn't automatically take the

23 filing outside the scope of filing appropriate amendments.

24 But as well, when an agent is asked to do something -- file

25 appropriate amendments; don't screw it up; don't make a

1   mistake -- if in the course of doing what they were told to
2   do -- file the UCC-3 statement -- they make a mistake, the
3   cases are crystal clear that mistakes don't take the action
4   outside the scope of the agency.

5       The *Goddard* case that we filed is very clear on that,
6   where the principal -- very briefly, the principal told a
7   person, "Go lend some money and get a security interest."
8   And the agent lent some money but forgot to get the security
9   interest.  And the principal sued him and said, "You
10  basically stole my money."  Sued him for conversion.  And the
11  court said, "Well, it wasn't conversion.  You gave it to him
12  as part of an agency.  And yes, he made a mistake, but it was
13  still within the scope of the agency."

14      And the *Morrow Crane* case, where the principal told the
15  agent, "Put the crane on a boat and ship it.  And don't put
16  it above, because I don't want it getting rusty.  Put it
17  below."  And the agent made a deal with the shipper and it
18  wound up above and it got rusty.  And the court said, "Well,
19  you know."  And the issue was, was that within the scope of
20  the agency?  And the court said yes, because mistakes within
21  the scope of the agency are binding.  Otherwise, Your Honor,
22  the exception would swallow the rule and the principal would
23  always say, "Well, that was a mistake" or "He didn't follow
24  my directions, and therefore I'm not bound."

25      And one of CNB's cases, it was exactly that, where the

1  principal said, "Well, those weren't the directions."  And
2  the court said, "Well, even if it weren't the directions,
3  you're still bound."

4      So agency law, to the extent it applies at all given the
5  facts, and we don't know the facts, it was within the scope
6  of the agency.

7      So then the UCC, we come back to the UCC, and the UCC
8  determines the consequence of that mistake.  And it has a
9  safe harbor for minor errors.  But *Pacific Trencher* has
10 already said, under identical facts, when the termination box
11 is checked by mistake, even when the collateral to be
12 released is listed, even when a corrective statement is
13 filed, that is a -- seriously misleading, and the safe
14 harbor, unfortunately, is not available.  So, Your Honor,
15 it's not available here.

16          THE COURT:  All right.  Thank you, Ms. Singer.

17          MS. SINGER:  You're welcome.

18          THE COURT:  Mr. Pepler, I said you could respond.

19          MR. PEPLER:  I will try to be brief, Your Honor.
20 Though I've spent a lot of time around the UCC -- I was an
21 observer to the National Conference of Commissioners on
22 Uniform State Laws when --

23          THE COURT:  All right.  But this isn't about you,
24 Mr. Pepler, so it's --

25      (Laughter.)

1          MR. PEPLER:  I have tried to bring a reasonableness

2    to this discussion, and I have been met with what I think is

3    resistance by the Committee that is completely unprincipled.

4        The scope of the agency in this case couldn't be more

5    clearly delineated than it is in the escrow instructions.

6    The Committee chooses to read and to recite half of one

7    sentence in describing that City National Bank authorized the

8    filing of appropriate statements.  They of course omit to

9    refer to what Your Honor doubtless has read, that the scope

10   of that agency is limited to release of the collateral

11   specified.

12       The law is completely different than it was when *Pacific*

13   *Trencher* was decided, by the simple fact that revised Article

14   IX eliminated the requirement of physical signatures to prove

15   authority.  You can file a financing statement without

16   signature.  You can file a termination statement without

17   signature.  That's why 9510(a) exists, because the test for

18   determining whether a financing statement is effective is

19   whether it was authorized.  And then it is only effective to

20   the extent that it was authorized.  That's true whether it's

21   an original filing or whether it's an amendment which

22   terminates or releases collateral.

23       Then the Secretary of State keeps what the drafters refer

24   to as an 'open drawer' of these financing statements, and

25   people can look at the dialogue between the parties filing

1  financing statements and determine the scope of the remaining
2  effectiveness of the filing.  Completely different than in
3  *Pacific Trencher*, where the rule was and the practice was, if
4  there was a termination statement filed, the Secretary of
5  State purged the files.  The case says that in the discussion
6  of the effect of a termination statement.  Never happens any
7  more.  Instead, what happens is that the financing statement
8  and any linked documents get filed with the Secretary of
9  State.  Subsequent searchers can make their own conclusions.
10 The standard of material error remains the same, but the
11 facts that are brought to bear on that are different.
12     So, in this case, we think that the record before Your
13 Honor supports a finding that there could not have been any
14 material misleading effect of the financing statement which
15 was delivered to release collateral.  And I don't think it
16 matters who in the chain between the secretaries at CNB and
17 the title company may have checked this box.  It wasn't
18 within the express scope of the authority granted by the
19 secured party to file the amendment.
20         THE COURT:  Assume, contrary to your argument, that
21 CNB is bound by the error of checking the thing, and talk
22 about the seriously misleading error in light of *Pacific
23 Trencher*.  Ms. Singer argues that *Pacific Trencher* holds that
24 the fact that you have the collateral delineated in the text
25 box is irrelevant once the termination box is checked.

1      MR. PEPLER: Right. And the clear distinguishing

2 fact which the Committee doesn't focus on is that, in *Pacific*

3 *Trencher*, there was only one box checked. It was the

4 termination. And under that there was a description of

5 collateral. In our case, there was a deletion of collateral

6 box checked when CNB sent the financing statement in, and

7 when it was filed, both the termination box and the deletion

8 of collateral box were checked.

9      So what the secured party in *Pacific Trencher* needed to

10 argue was, notwithstanding the clear expression of an intent

11 to terminate in a system where it was an on-off switch -- you

12 were either continued effective filing or terminated -- that

13 it had saved itself by filing a description of collateral to

14 be released. And then when they filed their subsequent

15 filing, I think Ms. Singer is a little off on the law,

16 because they didn't file a corrective statement. They didn't

17 exist. They re-perfected within the preference period by

18 filing a new UCC-1.

19      So, in our case, the financing statement continued

20 effective notwithstanding the amendment, and it could not be

21 seriously misleading because on its face there was both a

22 deletion of collateral box and a termination box. Under the

23 current system, that remains in the Secretary of State files,

24 and if there is a concern on the behalf of -- or on behalf of

25 subsequent searchers, all they need do is call the secured

1  party to determine whether the financing statement was

2  terminated or collateral was deleted from the blanket

3  description.

4      So I think that the -- both the rule and the system that

5  the rule applied are different now than they were in 1974.

6          THE COURT:  All right.  Thank you.

7          MS. SINGER:  Your Honor, may I just add something

8  very brief?

9          THE COURT:  Yes, you may, but I'll let opposing

10  counsel respond to it.  But go ahead.

11          MS. SINGER:  Okay.  I just want to point out that

12  under the new Article IX, the official comments to Section

13  9509 are crystal clear that law under this -- law other than

14  this article, including the law with respect to whether a

15  person has the requisite authority, will -- so -- so the

16  whole notion of whether or not a party has authority hasn't

17  been -- the cases that we're relying on remain relevant.

18      And the statute that *Pacific Trencher* relied on, the only

19  difference between *Pacific Trencher*, Your Honor, and this

20  case is that an extra box in *Pacific Trencher* was checked.

21  And that is not going to -- if anything, it's even more

22  confusing in this case, what happened.

23      But it relied on -- the statute that was simply

24  renumbered under Revised IX, there was an intent -- that

25  statute on which *Pacific Trencher* relies, 9506, is in Article

1   IX.  It just was renumbered.

2          THE COURT:  Okay.

3          MS. SINGER:  And finally, Mr. Pepler says, "Someone

4   could have just called us and then they wouldn't be

5   confused."  But that's not the way the UCC is set up at all.

6   It's supposed to be a blind.  You're supposed to able to look

7   at the public record and not be seriously misled.  And under

8   this case, looking at the documents that we've attached, it's

9   seriously misleading that the Secretary of State recorded the

10  financing statement as terminated.

11         THE COURT:  All right.  Thank you.

12     Mr. Pepler, very briefly, if you want to respond to

13  anything.

14         MR. PEPLER:  The Secretary of State has no

15  discretion to refuse a filing.  And the materially misleading

16  statement, I concede, continues in effect.  And I believe

17  that the financing statement as amended is not seriously

18  misleading and continues to perfect the security interest of

19  City National Bank.

20         THE COURT:  All right. I'm going to take this under

21  advisement.

22     I need a mechanism to know whether the sale closed.  Mr.

23  Kuhner, can I draft you to let me know at the close of

24  business Tuesday or opening of business Wednesday morning

25  whether the sale closed or not?  If it didn't close and they

1    just had to continue it for, you know, say, we're going to

2    close Friday instead of Tuesday, you can let me know Friday.

3        MR. KUHNER:  Okay.

4        THE COURT:  But if there's some major problem,

5    again, if you could let me know.  And all I want to know is

6    closing or not, when it's going to close.  I don't need

7    anything:  "Oh, by the way, I think one side or the other

8    made a great argument which I hope you'll give due

9    consideration to."

10       (Laughter.)

11       THE COURT:  Just the facts, ma'am, is what I'm --

12       And then what is going to happen, assuming there is no

13   ruling at the instant of closing, where will the proceeds be?

14   Will they be protected by court order?

15       MR. KUHNER:  I believe the previous stipulation has

16   the Debtor holding those.

17       THE COURT:  All right.  Is there any objection to

18   the Debtor taking the Debtor's agreed share upon closing?  I

19   think the only thing that's at issue in this motion is the --

20   what was that magic percent?

21       MR. KUHNER:  12-1/2.

22       MR. PEPLER:  They get 12-1/2.  City National gets

23   87-1/2.

24       THE COURT:  Yes.  All right.  So is there any

25   objection to the Debtor getting its 12-1/2 right upon

1  closing?

2        MR. KUHNER:  I think that's already been stipulated

3  to and it's an order.

4        THE COURT:  Okay.

5        MR. PEPLER:  It's no --

6        THE COURT:  And so --

7        MR. PEPLER:  No problem from the bank.

8        THE COURT:  And you'll continue to hold the 87-1/2

9  --

10        MR. KUHNER:  Yeah.

11        THE COURT:  -- so that it's available one way or the

12  other, depending on the ruling?

13        MR. KUHNER:  We'll do that.

14        THE COURT:  All right.  Any questions?  Anything

15  else?

16        MR. KUHNER:  We do have the third item that I

17  mentioned earlier.

18        THE COURT:  Okay.  Anything on the motion to --

19  concerning the proceeds?

20     (No response.)

21        THE COURT:  Okay.  Move to the third item, then.

22        MS. MANN:  Your Honor, may I be excused?

23        THE COURT:  Yes.

24        MS. MANN:  Thank you, Your Honor.

25        MR. KUHNER:  As Your Honor may or may not recall,

1  our previous cash collateral stipulation went through June

2  30th.  It's now July 2nd.  Prior to its expiration, we

3  negotiated with the bank about a continued use of cash

4  collateral.  We came to an agreement with the bank for a

5  limited extension through July 17th, a bare bones budget to

6  pay payroll, to make a payment to City National Bank, and

7  we've now agreed to make a payment to Carmel Partners, and

8  then some miscellaneous business expenses not to exceed

9  $3,000.

10       I believe that the bank has consented to the budget.  I'm

11  not sure if Carmel does now.  I believe that the Committee is

12  objecting to the payment to City National Bank.

13       Obviously, Your Honor, we need to use this cash

14  collateral.  We have payrolls.  The Debtor doesn't have a lot

15  of cash reserves, if any, to -- outside of this.  And we need

16  to use it.  And we'd like to have the stipulation approved.

17  We'd like to have everyone agree to it, but I think we're in

18  a situation now, unless the Committee will agree, and it

19  sounds like Your Honor is going to wait to rule on the lien

20  perfection issue, that what I'd like to ask is, unless

21  everyone here is consenting to this stipulation, that Your

22  Honor authorize us the interim use and set some sort of short

23  notice period to have this approved after notice to

24  creditors.

25                 THE COURT:  All right.  Thank you.  Ms. Singer, your

1  client is objecting?

2          MS. SINGER:  Yes, Your Honor.  And Mr. Litvak is

3  going to handle this portion of the hearing.

4          THE COURT:  All right.  Mr. Litvak, are you still

5  there?

6          MR. LITVAK:  Yes, Your Honor.  Can you hear me okay?

7          THE COURT:  Yes, I can.

8          MR. LITVAK:  Thank you, by the way, for allowing me

9  to appear by phone.  I apologize that I couldn't be there.

10  I'm out of state today.

11          THE COURT:  All right.  What do you wish to say?

12          MR. LITVAK:  Your Honor, we were -- we are only

13  objecting to one specific line item in this budget, and

14  that's a $60,000 adequate protection payment to City National

15  Bank.  The reason that we're objecting to that payment is the

16  same one that you just heard, which is that we believe that

17  their lien, City National Bank's lien, is in dispute and that

18  their security interest has been terminated.

19      And so what I was going to suggest to the Court is that,

20  at the very least -- we would have no problem having the

21  Court approve the stipulation, provided that the $60,000 is

22  not paid to City National Bank but rather segregated by the

23  Debtor so that the Debtor cannot use it, at least until the

24  Court determines this issue relating to the pending motion.

25          As Ms. Singer mentioned, depending on the outcome of that

1  -- I mean, obviously, we're urging the Court simply to deny

2  the motion and that the 87-1/2 percent proceeds just stay --

3  remain segregated so that we can bring a complaint to

4  determine the extent and validity of City National Bank's

5  liens.

6      We would ask for the same thing with respect to this

7  adequate protection payment.  We shouldn't be paying $60,000

8  in adequate protection to City National if in fact they don't

9  have an interest in cash collateral because their underlying

10  security interest was terminated.

11      Your Honor, just in terms of, you know, the context of

12  this, I have been following up with the Debtor as well as

13  with the bank, their counsel, regularly over the last couple

14  of weeks in terms of what was intended with respect to this

15  cash collateral stipulation that expired on June 30th.  At

16  first I didn't get any information, then I started to get

17  some communications that they were working on a stopgap kind

18  of a bare-bones budget to extend the period of authorized

19  cash collateral use through July 17th.

20      And then all of a sudden, you know, we get this budget

21  dropped on us yesterday that suddenly has a $60,000 adequate

22  protection payment to City National Bank.  You know, despite

23  repeated requests, we never got the budget until yesterday,

24  and I guess I understand from counsel that they're going to

25  put that over for notice.  I don't have any problem with that

1  at all.

2      Generally speaking, Your Honor, we're -- in terms of the

3  status of the case, just to bring you up to speed, we have

4  regularly tried to have communications with the Debtor about

5  where the case is going, what's the exit strategy, what's the

6  end game, is there going to be a reorganization plan here?

7  And really, we've seen no progress at all in the case, other

8  than this one pending sale, which I'm glad to hear is

9  supposed to close very, very soon.

10      We don't feel like the Debtor has been moving forward

11  with a sufficient level of urgency or with a sufficient level

12  of flexibility in terms of doing what needs to be done in

13  order to try and realize value from the assets that are

14  available in this estate.

15      That's just to put it a little bit in perspective, Your

16  Honor, just to give you a little bit of context.  Again, we

17  don't have any problem with the necessary expenditures that

18  have to be made under this budget, but given where the Debtor

19  stands today -- and it is somewhat precarious -- given our

20  disputes, pending disputes with the liens asserted by City

21  National Bank, we would urge the Court at a minimum to

22  approve the cash collateral budget provided that the $60,000

23  in adequate protection is segregated pending a determination

24  of the validity of City National Bank's liens.

25          THE COURT:  All right.  Thank you, Mr. Litvak.  Mr.

1    Pepler, let me ask you this.

2              MR. PEPLER:  Yes.

3              THE COURT:  If I were to go along with the

4    suggestion made by the Committee about impounding the

5    $60,000, would there still be a -- is there still a

6    stipulation?

7              MR. PEPLER:  I have made it clear to Mr. Litvak that

8    we would not consent unless we got the money.  And I -- this

9    explains why the ruling on the issue of the continuing

10   validity of the lien is not advisory.  Mr. Litvak raises this

11   in every possible context.  It's the reason why we can't move

12   anything forward.

13       So, no, we would not consent to this -- to the continued

14   use of cash without receiving a payment of adequate

15   protection.

16             THE COURT:  Mr. Kuhner, are there any expenses that

17   the Debtor needs to make between now and the close of

18   business Tuesday in order to avoid immediate and irreparable

19   injury to the estate?

20             MR. KUHNER:  Mr. Nyberg has a better handle on that.

21             MR. NYBERG:  I believe, Your Honor, the --

22             THE COURT:  I need you behind a microphone, please.

23             MR. NYBERG:  Eric Nyberg, Your Honor.

24       I think the only two would be one is payroll and the

25   other is rent.  Because the rent is due on July 1st.  I don't

1   know what the grace period is.  It could be ten days.  But I
2   would say that those would be the two:  payroll and rent.
3   　　　　THE COURT:  And when is the payroll?
4   　　　　MR. NYBERG:  The payroll is July 3rd.  It's
5   tomorrow.  So it has to be --
6   　　　　MR. PEPLER:  Your Honor, may I speak to the payroll?
7   I mean, the payroll has to be funded three days before the
8   pay date, and I agreed with Mr. Nyberg, notwithstanding what
9   I just said, that we didn't want to harm the employees and
10  that the bank would consent to the use of cash to pay the
11  payroll due July 3rd.  So that's funded.  But it was based on
12  the understanding that we would move forward and get this
13  cash collateral stipulation extension approved.
14  　　　　THE COURT:  Well, what if you don't get it -- if
15  it's to be approved, and this isn't a ruling, if it's to be
16  approved, it isn't going to come before Tuesday.  In that
17  case, is there still funds for the Debtor to make the
18  payroll?
19  　　　　MR. PEPLER:  The payroll has already been funded,
20  Your Honor.
21  　　　　THE COURT:  All right.
22  　　　　MR. PEPLER:  It's -- the question is whether the
23  bank gets the benefits of the remaining adequate protection
24  components of the stipulation.
25  　　　　THE COURT:  All right.  I'll tell you what, Mr.

1  Nyberg.  I have to take approval of the stipulation under
2  advisement.  If it turns out that the bank is unsecured and I
3  so rule, we go one way.  If the bank is secured, then I guess
4  I can approve the stipulation.  And if there needs to be an
5  evidentiary hearing, which is what the Creditors' Committee
6  is pressing for, we'll just have to cross that when we get to
7  it.
8      As far as the rent goes, --
9          MR. NYBERG:  We might be able to push that out,
10  because usually -- I mean, usually there is a grace period.
11  So --
12          THE COURT:  All right.
13          MR. NYBERG:  So if it's due on the 1st, I'm sure we
14  have a couple of days' grace.  And with the holiday weekend,
15  hopefully people won't be watching too closely.
16          THE COURT:  All right.  All right.  So if and to the
17  extent that Court approval is needed to authorize funding of
18  the payroll and related expense items -- you know, the
19  withholding and all those goodies -- that's approved.  To the
20  extent that the Debtor is seeking a complete ratification of
21  the stipulation, I'll take that under submission as well.
22          MR. NYBERG:  Thank you.
23          MR. PEPLER:  Thank you.
24          MR. FELD:  Your Honor?
25          THE COURT:  Yes?

1          MR. FELD:  This is --

2          THE COURT:  Is that Mr. Litvak?

3          MR. FELD:  No, this is Alan Feld for CP III, another

4    secured creditor.

5          THE COURT:  Yes, Mr. Feld.  Yes?

6          MR. FELD:  Your Honor, I just wanted to state for

7    the record that we have no objection to the stipulation,

8    provided that we're afforded the same protections as in the

9    prior cash collateral agreement, including the monthly

10   payment, which I believe Mr. Nyberg has now budgeted as an

11   adequate protection payment.  We're -- we understand that

12   that, of course, is effective when and if the stipulation is

13   approved.

14       And we also, like Mr. Litvak, saw the stipulation and the

15   budget for the first time last night, so we're working with

16   Mr. Nyberg on signing off on that.

17         THE COURT:  All right.

18         MR. KUHNER:  And that's correct, Your Honor.

19         THE COURT:  All right.  Mr. Kuhner -- I don't know

20   if you heard Mr. Kuhner.  He confirms your understanding.

21         MR. FELD:  Okay.  Thank you very much.

22         THE COURT:  All right.  Any other business before

23   the Court?

24       (No response.)

25         THE COURT:  All right.  We may need to schedule some

1  hearings next week, depending on what happens.  But at this

2  point, I think I'll just wait to see if the sale closes, and

3  I will undertake to respond to a closing as quickly as I

4  possibly can after that closing.

5          MR. KUHNER:  Thank you, Your Honor.

6          MR. PEPLER:  Thank you, Your Honor.

7          THE COURT:  All right.  Thank you all.

8      (Proceedings concluded at 3:24 p.m.)

9                          --oOo--

10

11

12

13

14

15

16

17

18                      CERTIFICATE

19      I certify that the foregoing is a correct transcript

20  from the electronic sound recording of the proceedings in the

21  above-entitled matter.

22

23  _____    _____

24  Kathy Rehling                             Date
    Certified Electronic Court Transcriber
25  CET**D-444

1                          INDEX

2

PROCEEDINGS                                                3

WITNESSES

EXHIBITS

RULINGS

- Trial Schedule                                           8
- Motion Taken Under Advisement                           23
- Approval of Payroll Expenses                            32
- Cash Collateral Stipulation Taken Under Advisement      32

END OF PROCEEDINGS                                        34

INDEX                                                     35